Lisette BALINT, Plaintiff–Appellant,

v.

CARSON CITY, NEVADA, a consolidated municipality; Rod Banister, in his official capacity only as Carson City Sheriff; Kay Bennett; Tom Tatro; Janice Ayres; Greg Smith, in their official capacities only as Board of Supervisors, Carson City, NV, Defendants–Appellees.

No. 96–17342.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 19, 1998.

Decided June 14, 1999.

John N. Schroeder, Reno, Nevada, for the plaintiff-appellant.

Mark Forsberg, Deputy District Attorney, Carson City, Nevada, for the defendants-appellees.

Fred M. Blum, Jaffe, Martini & Blum, San Francisco, California, and Marc D. Stern, American Jewish Congress, New York, New York, for amici curiae American Jewish Congress and Seventh Day Adventist Church.

Stephen C. Balkenbush, Thorndal, Armstrong, Delk, Balkenbush & Eisinger, Reno, Nevada, for amici curiae Nevada Association of Counties and Nevada League of Cities.

Before: HUG, Chief Judge,
BROWNING, REINHARDT,
BRUNETTI, KOZINSKI, THOMPSON,
FERNANDEZ, T.G. NELSON,
KLEINFELD, TASHIMA, and
THOMAS, Circuit Judges.

Opinion by Judge T.G. NELSON;
Dissent by Judge KLEINFELD.

T.G. NELSON, Circuit Judge:

This appeal presents the question of whether the existence of a bona fide seniority system obviates the duty to reasonably accommodate the religious needs of an employee pursuant to Title VII. We hold that the mere existence of a seniority system does not relieve an employer of the duty to attempt reasonable accommodation of its employees' religious practices, if such an accommodation can be accomplished without modification of the seniority system and with no more than a de minimis cost. Because the district court granted summary judgment based on the mere existence of a seniority system and because there are genuine issues of material fact to be decided, we reverse and remand.

## I. FACTS AND PROCEDURAL HISTORY [1]

Lisette Balint is a member of the Worldwide Church of God ("the Church"). A central tenet of the Church is the strict observance of the Sabbath from sundown Friday to sundown Saturday. The Church proscribes all forms of secular work during the Sabbath observance.

In February 1995, Balint was offered a position in the detention department of the Carson City Sheriff's Department ("the Department"). In mid-March, Balint completed the requisite physical, psychological and drug testing and was told to report to work for a swing shift on Friday, March 31, 1995. At that time, she informed the Department that she could not work during her Sabbath and requested that her schedule be adjusted to accommodate her religious practice. Balint specifically offered to split her days off work, to work on Sundays and to take only the actual Saturday Sabbath off. On March 22, 1995, Lieutenant Dimit, the head of the detention department, informed her that there could be no accommodation. Balint then withdrew her application with the Department.

Balint filed an action against Carson City; Rod Banister, the Carson City Sheriff; and four members of the Carson City

---

1. This case was originally decided by a three-judge panel in a decision reported at 144 F.3d 1225 (9th Cir.1998). Although the panel opinion was withdrawn when the court voted to rehear the case en banc, 152 F.3d 1223 (9th Cir.1998), we have adopted much of what follows in this section from the panel's opinion.

Board of Supervisors alleging that Carson City ("the City") had engaged in religious discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(e)(1), and the Nevada state anti-discrimination statute. She also alleged that the defendants were negligent in supervising Lieutenant Dimit by allowing him to violate the antidiscrimination statutes.

The City countered by arguing that it was not required to accommodate Balint because of its seniority-based, shift-bidding system. Every six months, the twelve or thirteen deputies assigned to the jail bid for shifts in order of seniority. A deputy cannot bid for the same shift he or she is currently working. There is only one deputy with both Saturday and Sunday off. This system is a long-standing practice of the Department, although not the subject of any written document. Similarly, although deputies are permitted to trade shifts for personal emergencies on a one-time basis, there is an unwritten rule prohibiting deputies from trading shifts on a regular basis.

After permitting limited discovery solely on the question of "whether the Carson City Sheriff's Department has a neutral shift-bidding system in effect," the district court granted defendants' motion for summary judgment. The court first held that Balint had established a prima facie case of discrimination. It went on to hold that in light of the Department's bona fide shift-bidding system, any accommodation of Balint's religious practices would constitute an undue hardship as a matter of law.

## II.  STANDARD OF REVIEW

We review grants of summary judgment de novo. *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir.1997).

The appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether the district court correctly applied the relevant substantive law and whether there are any genuine issues of material fact. *Id.*

## III.  ANALYSIS

This case requires us to make two decisions. First, we must decide whether the mere existence of a seniority system shields an employer from the duty to reasonably accommodate an employee's religious beliefs. This question requires an examination of the interrelationship of the statutory provisions for reasonable accommodation and seniority system protections. Second, we must determine whether the district court properly granted summary judgment on the basis that the City could not accommodate Balint without incurring an undue hardship.

A.  *Interrelationship of Religious Accommodation and Seniority Systems Under Title VII*

Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion." 42 U.S.C. § 2000e–2(a)(1). Religion is defined to include all aspects of religious observance except those that the employer cannot reasonably accommodate.[2]

■■■ As a general matter, this court applies a two-part framework to review claims of religious discrimination under Title VII. *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 681 (9th Cir.1998) (citing *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir.1993)). First, the employee has the burden to establish a prima facie case of religious discrimination. *Id.*[3] Second, if

---

**2.** "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

**3.** A prima facie case of religious discrimination is proven if (1) the employee has a bona fide religious belief, the practice of which conflicted with an employment duty; (2) the employee informs the employer of the belief and conflict; and (3) the employer threatens or subjects the employee to discriminatory treatment because of the employee's inability

the employee has proven his or her prima facie case, then the employer has the burden to show either that it attempted to reasonably accommodate the employee's religious beliefs or that any accommodation of the employee's needs would result in undue hardship. *Id.*

We assume that Balint has established a prima facie case of discrimination because the City has conceded, for the purposes of this appeal, that Balint was denied employment due to her refusal to work on her Sabbath. The City has also conceded that it took no steps to accommodate Balint's request for observance of her Sabbath.[4] Thus, the issue before us is whether any accommodation would impose an undue hardship on the City.

The City contends that any accommodation, in light of its neutral, shift-bidding seniority system, would be an undue hardship as a matter of law. The City argues that § 2000e–2(h) of Title VII, which permits the operation of bona fide seniority systems "notwithstanding any other provision of this subchapter," is a complete defense to Balint's religious accommodation claim. The City further relies on *Trans World Airlines v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), to support its view of the peremptory effect of the seniority system provision.

1. *42 U.S.C. § 2000e–2(h).*

We begin our analysis with the seniority system provision itself. Section 2000e–2(h) provides:

> Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, . . . provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex or national origin. . . .

By its plain language, § 2000e–2(h) merely articulates that seniority systems are not, in and of themselves, illegal employment practices.[5] Under the statute, seniority systems are a valid method of providing different levels of compensation and privileges, even if they have a discriminatory impact on employees.[6] The statute does not, however, state that employers with seniority systems are exempt from the other requirements of Title VII. Nor does the language "notwithstanding any other provision of this subchapter" provide such an exemption. Quite plainly this language means that no other provision in Title VII can transform an otherwise valid seniority

to fulfill the job requirements. *Tiano,* 139 F.3d at 681.

4. In *EEOC v. Hacienda Hotel,* 881 F.2d 1504 (9th Cir.1989), we stated that "at a minimum, the employer was required to negotiate with the employee in an effort reasonably to accommodate the employee's religious beliefs." *Id.* at 1513. However, in *Heller,* we clarified that an employer is not required to attempt or negotiate an accommodation when the employer "can show that any accommodation would impose hardship." 8 F.3d at 1440 (citing *EEOC v. Townley Eng'g & Mfg. Co.,* 859 F.2d 610, 615 (9th Cir.1988)). "If an employer can show that no accommodation was possible without undue hardship, it makes no sense to require that he engage in a futile act." *Townley Eng'g,* 859 F.2d at 615. Thus, the fact that the City did not negotiate with Balint does not resolve any issue presented by this appeal.

5. Section 2000e–2(h) was

not designed to alter the meaning of Title VII generally but rather "merely clarifies its present intent and effect". . . . [I]t is apparent that the thrust of the section is directed toward defining what is and what is not an illegal discriminatory practice in instances in which the post-Act operation of a seniority system is challenged as perpetuating the effects of discrimination occurring prior to the effective date of the Act.
*Franks v. Bowman Trans. Co.,* 424 U.S. 747, 761, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) (citations omitted).

6. Congress was concerned that Title VII would invalidate many existing seniority systems. Section 2000e–2(h) was enacted so that seniority systems could not be invalidated unless there was a showing of an employer's discriminatory intent. *American Tobacco Co. v. Patterson,* 456 U.S. 63, 64–65, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982).

system into an illegal employment practice. Contrary to the City's argument, § 2000e–2(h) is not a complete defense to Balint's religious accommodation claim.

### 2. *Trans World Airlines v. Hardison.*

The Supreme Court's decision in *Hardison* supports our interpretation of the bare language of § 2000e–2(h). Because both parties heavily relied upon *Hardison* to support their arguments, we review the case here in detail.

Larry G. Hardison was employed by TWA, in a department operated 24 hours a day, 365 days a year. In his position, Hardison worked five days on, two days off. TWA employees bid for work shifts in accordance with a seniority system implemented pursuant to a collective bargaining agreement between TWA and Hardison's union. After Hardison worked for TWA for some months, he embraced the beliefs of the Worldwide Church of God, which require the observance of the Sabbath from sundown Friday to sundown Saturday. Hardison initially bid for a shift that accommodated his religious needs; however, when he transferred to a different building, he did not have sufficient seniority to bid for a shift which would permit him to observe his Sabbath.

The union refused to allow exceptions to the seniority system which would enable Hardison to trade shifts. TWA rejected Hardison's proposal to work only four days a week on the grounds that Hardison's job was essential and it could not leave the position unfilled; moving a supervisor from another area would have resulted in undermanning in that area; and filling that day with another employee working a different shift would have required paying overtime wages.

When Hardison did not report for work on his Sabbath, he was discharged for insubordination. He filed an action under Title VII. Hardison was unsuccessful in the district court, but obtained a reversal from the Eighth Circuit, 527 F.2d 33 (1975), which "held that TWA had not satisfied its duty to accommodate." *Hardison*, 432 U.S. at 70, 97 S.Ct. 2264.

In its opinion reversing the Eighth Circuit, the Supreme Court first analyzed § 2000e(j)'s accommodation requirements, without mentioning the seniority system provisions of § 2000e–2(h). After reviewing the legislative history of § 2000e(j), it said that the effect of the definition of religion "was to make it an unlawful employment practice under [§ 2000e(a)(1)] for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." *Id.* at 74, 97 S.Ct. 2264. The Court noted, however, that while it was "clear" that a duty to accommodate short of undue hardship existed, the scope of that obligation had not been "spelled out by Congress or by EEOC guidelines." *Id.* at 75, 97 S.Ct. 2264.

The Court then considered the facts of Hardison's case, including the efforts made by TWA and the existence of the seniority provisions in the collective bargaining agreement, within the context of the uncertain scope of § 2000e(j). The Court rejected Hardison's argument that TWA was required to violate the seniority system in order to provide him with a religious accommodation. *Id.* at 79, 97 S.Ct. 2264. The Court ultimately concluded that reasonable accommodation under § 2000e(j) did not require some employees to be deprived of their shift and job preferences "in order to accommodate or prefer the religious needs of others . . . ." *Id.* at 81, 97 S.Ct. 2264. To do so would constitute "unequal treatment" of employees not contemplated by Title VII. *Id.*

The Court stated that its conclusion was supported by the "special treatment" afforded to seniority systems under § 2000e–2(h). In doing so, it stated: "[A]bsent a discriminatory purpose, the operation of a seniority system cannot be an unlawful employment practice even if the system has some discriminatory consequences." *Id.* at 82, 97 S.Ct. 2264. In summing up the treatment to be afforded seniority systems, in terms which amplify

its statement quoted above, the Court stated: "TWA was not required by Title VII to carve out a special exception to its seniority system in order to help Hardison to meet his religious obligations." *Id.* at 83, 97 S.Ct. 2264.

The Court did not stop there, however. It went on to examine whether other alternatives—short of infringing on the seniority system, such as placing Hardison on a four-day week or offering to pay premium wages to another employee to work on Hardison's Sabbath—would cause TWA an undue hardship. The Court held that these alternatives would leave TWA shorthanded or require it to bear additional costs. *Id.* at 84, 97 S.Ct. 2264. The Court concluded that "[t]o require TWA to bear more than a de minimis cost in order to give Hardison Saturdays off is an undue hardship" which § 2000e(j) did not require. *Id.*

■ In the case before us, the City's argument is the mirror-image of the arguments made in *Hardison.* The essence of Hardison's argument was that the religious accommodation provision took precedence over TWA's seniority system. *Id.* at 79, 97 S.Ct. 2264. Here, the City argues the opposite—that its seniority system trumps the duty to accommodate religious practices. *Hardison* has already settled this seeming conflict between § 2000e(j) and § 2000e-2(h). In harmonizing these provisions, the Supreme Court stated that "neither a collective-bargaining contract nor a seniority system may be employed to violate the statute, but we do not believe that the duty to accommodate requires TWA to take steps inconsistent with the otherwise valid agreement." *Id. Hardison* clearly illustrates that the provisions for religious accommodation and for seniority system protection coexist in the statute; these provisions are not mutually exclusive. This is the very heart of the *Hardison* decision. Viewed from any angle, it is clear that the Supreme Court did not regard the requirements of religious accommodation and seniority systems as mutually exclusive.

The Supreme Court did not hang its decision on the invincibility of seniority systems, but merely indicated that the "special treatment" of seniority systems under Title VII supported its conclusion regarding the scope of accommodation required of TWA. Yet, the City would have this court read the two pages of *Hardison* which discuss the "special treatment" of seniority systems in a vacuum and ignore the twelve pages of the opinion which discuss reasonable accommodation and undue hardship. This is a myopic view of the case. The language of the seniority system provision is not the end of the analysis, as the City suggests. If that were so, there was no need for the Court to conduct an extended discussion of reasonable accommodation or an analysis of the undue hardship presented by accommodations which did not infringe upon TWA's seniority system. *Hardison* simply cannot be read for the proposition that the mere existence of a seniority system negates the duty to reasonably accommodate.

■ We believe the City's view of both *Hardison* and the statute is too narrow. Rather, we agree with Balint that, under the reasoning of *Hardison,* the provisions of § 2000e-2(h) are not a defense if reasonable accommodation can be made without impact on the seniority system and with no more than a de minimis cost to the City. Since the duty to reasonably accommodate does not include violating the terms of a seniority system, as discussed above, there is no conflict between § 2000e-2(h), the seniority system provision, and § 2000e(j), the definition of religion. Rather, these statutory provisions coexist. No damage is done to seniority systems by requiring reasonable accommodation of religious beliefs. Employers need not transgress upon their seniority systems to make accommodations, but they are required to attempt accommodations that are consistent with their seniority systems and that impose no more than a de minimis cost.

■ The district court failed to apply the correct substantive law when it held that because the City had a neutral seniority system, any accommodation would be an undue hardship as a matter of law. We hold that the existence of a neutral seniority system does not relieve the employer of its duty to reasonably accommodate the religious beliefs of its employees, so long as the accommodation can be accomplished without disruption of the seniority system and without more than a de minimis cost to the employer.

## B. *Summary Judgment: Accommodation and Undue Hardship*

When the district court granted summary judgment to the City, it did not consider whether there was an available accommodation which would not disrupt the seniority system and would not result in more than a de minimis cost to the City. However, since we can affirm on any basis in the record, we must determine if there is sufficient evidence to support the district court's grant of summary judgment. *See United States v. Washington*, 969 F.2d 752, 755 (9th Cir.1992). We may affirm the district court if, viewing the evidence in the light most favorable to Balint, we determine there are no genuine issues of material fact as to undue hardship on the City. *See Summers v. A. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir.1997). This court does not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial. *Id.*

The district court limited discovery to the "issue of whether the Carson City Sheriff's Department has a neutral shift-bidding system in effect." Pursuant to the district court's discovery order, Balint took the depositions of Dwight Dimit, the lieutenant in charge of the jail, and William Callahan, the Chief Deputy in the Sheriff's office. In addition to providing information about the Department's shift-bidding system, the depositions include information regarding shift trading and shift splitting.[7] These depositions and the brief hearing conducted by the district court form the record available on review.

■ What constitutes undue hardship must be determined within the particular factual context of each case. *American Postal Workers Union v. Postmaster General*, 781 F.2d 772, 775 (9th Cir.1986). As guidance, we have previously stated that an accommodation results in undue hardship when there is more than a de minimis cost to the employer, which could include "additional costs in the form of lost efficiency or higher wages." *Opuku–Boateng v. California*, 95 F.3d 1461, 1468 n. 11 (9th Cir.1996) (citing *Hardison*, 432 U.S. at 84, 97 S.Ct. 2264). Undue hardship may also be present when an accommodation would cause more than a de minimis impact on coworkers, such as depriving coworkers of seniority rights or· causing coworkers to shoulder the plaintiff's share of potentially hazardous work. *Id.* at 1468 n. 12; *see also Bhatia v. Chevron U.S.A., Inc.*, 734 F.2d 1382, 1384 (9th Cir.1984). On appeal, Balint raises the possibility of two accommodations: voluntary shift trades and split shifts.

### 1. *Voluntary Shift Trades.*

■ Both officers testified during their depositions that shift trades were only done on a one-time, emergency basis. Lieutenant Dimit testified that no permanent shift trades were allowed because of the logistical and personnel problems they created. In an affidavit attached to his deposition testimony, Chief Deputy Callahan indicated that additional deputies are scheduled to work on Fridays and Saturdays because that is the busiest time at the jail, but those days off were the most sought after by employees because of the "additional work factors," such as the potential of dysfunctional arrests on these

---

7. The parties have defined shift splitting as not having two days off consecutively, but rather splitting days off during the work week. For example, an employee with Tuesdays and Sundays off would be working a split shift under the parties' definition.

shifts. Callahan also testified that covering Friday or Saturday shifts for a junior deputy would result in overtime costs. He stated, "[i]n order to accommodate an individual's request such as this requires significant difficulty and expense, which would tap the overall financial resources of the Department, the individuals employed in our Facility and disrupt the standard operational functions of the Facility." Balint offered no contrary testimony or declarations.

Thus, the uncontroverted testimony indicates that the City conducts scheduling of shifts in accordance with its long-standing seniority system.[8] The City does not allow permanent shift trading among its employees.[9] Activities at the jail are at their peak Friday and Saturday, the days on which Balint seeks her accommodation. The testimony indicates that permanent shift trades would force the City to incur additional costs, as well as logistical and personnel problems. Further, Balint's co-workers would be forced to bear the burden of working on the busiest, most difficult shifts, and their seniority rights would be affected. Thus, there is no genuine issue of material fact as to whether shift trades would cause the City an undue hardship.

2. *Shift Splitting.*

■ Balint specifically requested the accommodation of a split shift in her conversation with Lieutenant Dimit on March 22, 1995. There is no history of split shifts in the detention department. The no shift-

splitting policy does not appear to be tied to the seniority system, which relates to the choice of available shifts, not to the creation of particular shifts. Implementing a split shift may well impact what shifts are available for bidding by the employees. However, this impact is related only to the type of shifts available. The more senior employees would still be able to bid for their shift preference within the available choices. For instance, if the City implemented two shifts which had split days off, a more senior employee could still bid for a shift with two consecutive days off while a less senior employee might end up with a split shift. Accordingly, a split shift system would not affect the ability of more senior employees to bid for their shift preferences and thus, does not create a direct conflict with the existence of the seniority system.

This said, we are still left with the question of whether a split-shift system would create an undue hardship on the City. The evidence in the record on this point distinctly raises a factual question regarding the effect of split shifts on the department. In response to a question about whether there were any rules prohibiting split shifts, Chief Deputy Callahan stated that he didn't "know if there would be hardships or not for [Lieutenant Dimit] to schedule people in that fashion." Chief Deputy Callahan also testified that he didn't know of any contractual or personnel reason which would proscribe split shifts. On its face Chief Deputy Calla-

8. This case is distinguishable from *Opuku–Boateng* since that case did not involve a bona fide seniority system. All employees were required to work an equal number of undesirable shifts. *Opuku–Boateng*, 95 F.3d at 1470. That is unlike the situation in *Hardison* or this case where only some employees are required to work undesirable shifts and these shifts are bid by seniority. Based on the type of scheduling system involved in *Opuku–Boateng*, the court determined that shift trading might not have been an undue burden on the employer. *Id.* at 1470–74. Here, seniority determines which employees will work the most undesirable shifts, and even voluntary shift trades cause an undue hardship.

9. This case is, thus, distinguishable from *Hacienda Hotel* where we held that allowing voluntary shift swaps did not cause an undue hardship. In *Hacienda Hotel*, the employer "flexibly applied" its seniority system, making exceptions for a permanent shift change of one employee due to personal safety concerns. 881 F.2d at 1513 n. 7. We stated that "[t]o the extent that Hacienda provided consideration for the personal safety concerns of one employee, it cannot discriminatorily deny such consideration for the religious needs of others." *Id.* Here, while the City may make exceptions on a one-time, emergency basis, it is the City's policy not to allow permanent shift trades.

han's testimony raises a factual question as to the City's hardship.

Lieutenant Dimit's ostensibly contrary testimony emphasizes the presence of a factual question. Lieutenant Dimit speculated that "without looking" at the personnel regulations or how split days off would work, the department "*could* run into problems with the contract" regarding a forty-hour work week. (Emphasis supplied.) He indicated that there might be a problem determining when the work week began and how many hours were worked during that week. Lieutenant Dimit gave the example of when an employee is in training, a work week might need to be changed and the employee could end up working eighty-eight hours in a two-week period. However, this example fails to demonstrate Lieutenant Dimit's point as scheduling on a one-time basis for training has no stated relationship to the implementation of a permanent split shift.

Lieutenant Dimit's testimony as to split shifts is, at best, speculative and somewhat tangential. His testimony simply does not show anything material about split shifts. If anything, it only highlights the existence of a factual question already raised by Chief Deputy Callahan's testimony. Thus, based on the limited record before this court, a genuine issue of material fact exists as to whether implementing a split shift schedule would create an undue hardship for the City.[10]

### IV. CONCLUSION

The mere existence of the City's seniority system does not relieve it from the duty to attempt reasonable accommodation of its employees' religious practices. If an accommodation can be achieved short of interfering with the City's seniority system and with no more than a de minimis cost to the City, it should be attempted. On the present record there is a genuine issue of

material fact as to whether such an accommodation exists. We, therefore, reverse and remand to the district court for proceedings consistent with this opinion.

REVERSED and REMANDED for further proceedings.

KLEINFELD, Circuit Judge, with whom BRUNETTI, KOZINSKI, and FERNANDEZ, Circuit Judges, join, dissenting in part:

I agree with the majority on the law, but disagree on the application of law to fact that results in a remand.

The majority holds that a bona fide seniority system does not relieve an employer of the duty to make reasonable accommodation, if that accommodation can be accomplished consistently with the seniority system and with no more than de minimis cost. I agree that that is a correct reading of *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). The majority holds that because the seniority system in the case at bar prohibited employees from trading shifts on more than an emergency basis, requiring permanent shift trading to accommodate appellant's religious beliefs would cause the City an undue hardship. That too is correct.

But the majority errs, in my view, in holding that there is a genuine issue of fact about whether "splitting shifts" to accommodate appellant's religious beliefs would be an undue hardship for the City. What the majority means by "split shifts" is split days off, so that instead of a two day weekend, an employee would have two one-day breaks (e.g., work swing shifts, take Friday off, work Saturday, Sunday, Monday, take Tuesday off, work Wednesday and Thursday). Appellant suggested this so that she could take her Sabbath off.

---

10. A scheduling system which included split shifts may still not provide a permanent accommodation for Balint. Arguably, split shifts would be less desirable than shifts with two consecutive days off, and Balint may be able to successfully bid for a split shift as a result. If, however, an employee more senior to her should bid for the split shift, Balint would be right back where she started. This question and others relating to shift splitting remain for the parties to explore before the district court.

I believe the record establishes that this accommodation would cause more than *de minimis* cost to the City, and thus, is not required. The reason the majority errs, in my view, is that although the opinion correctly states the basic holding of *Hardison,* the majority gives too little weight to the preclusive effect a bona fide seniority system has on religious discrimination claims, and erroneously converts a *de minimis* cost standard into something more demanding.

Lieutenant Dwight Dimit testified that he is the person who actually does the shift assignments. The majority says that there is a genuine issue of fact because Lieutenant Dimit's supervisor, Chief Deputy William Callahan, did not know whether or not there would be hardships for Dimit in scheduling split shifts. But Chief Deputy Callahan's lack of knowledge about operational details does not contradict anything Lieutenant Dimit said and does not create a genuine issue of fact. In any office, there will be some things that the boss does not know about the operational details of the work performed by those the boss supervises. Shift assignment was Dimit's job, not Callahan's, so Dimit, not Callahan, knew how much trouble split shifts would entail.

Lieutenant Dimit testified that "I do the schedule." The way he did it was that twice a year, he hung a memorandum on a bulletin board, with a list of all deputies' names in order of seniority. In seniority order, they bid for shifts, such as swing shift with Sunday and Monday off. Anyone on a day shift had to take a swing shift or graveyard shift for the next six months. The memorandum lists each shift, in the form

SWING

S1–Tue/WedS3–Thr/Fri

S2–Sun/MonS4–Fri/Sat

On the bottom part of the page, the fourteen deputies are listed in order of seniority. They fill in blanks next to their name, in seniority order, in the form,

| | | |
|---|---|---|
| 1. | FARRELL | S2 |
| 2. | JONES | D2 |
| 3. | JANAS | R1 |
| 4. | KELLER | TR |
| 5. | STEEL | G1 |

[Remaining nine deputies omitted.]

This election procedure generates a chart for each month of the six month period, with the fourteen deputies listed down the left axis, and each day of each month along the top axis, with a code filled into each box for day, swing graveyard, or time off.

The jail had never split days off before, so when Balint's lawyer asked Dimit about what that would entail, he was necessarily asking about a hypothetical circumstance with which the jail had no experience. The fact that split days off had never been done, and that there was a long established system of two consecutive days off as part of the assignment system, means that splitting days off as Balint proposed would conflict with the established seniority system. When Balint suggested split days off to Dimit, he bucked her suggestion up to his supervisor, Chief Deputy Callahan. Dimit testified that the occasional shift swap had become "a logistic nightmare," so they were discouraged. If Balint were allowed to split her weekends, then "we could run into problems with the contract" because of "[e]xcess of 40 hours worked in a week." Under the terms of the City's agreement with the deputies, Lieutenant Dimit expected to run into problems with overtime. Figuring the start and end of the seven-day workweek for overtime computation purposes would be problematic, Lieutenant Dimit thought, if the two days off were nonconsecutive.

Balint's unavailability for Friday evening to Saturday evening posed an especially difficult problem because Friday night is a busy law enforcement night. Because they do not have to go to work the next morning, many people do something a little different on the nights before their days off. Some people, who have always provided a disproportionate share of police and jailer's work, go out, get drunk, and get in fights. *See, e.g., United*

*States v. Cunningham*, 54 F.3d 295, 302 (7th Cir.1995) (referring to "a routine Friday night bar fight" and saying "fights among young men on Friday nights in places like Cedar Lake, Indiana—following too many beers—are not uncommon. Retaliation for some actual or perceived insult is often the cause of these 'head thumpings.' "). Deputy Chief Callahan wrote in his affidavit that "more arrests and bookings occur in Detention on Friday and Saturday evenings ... a 25% higher rate of bookings." Deputy Chief Callahan wrote that the "dysfunctional" arrests those nights caused many deputies to "prefer that their days off fall on Friday and Saturday." But because of the additional arrest rate, Lieutenant Dimit testified that Friday and Saturday nights were the only time he needed three deputies, instead of two, on the graveyard shift.

Chief Deputy Callahan submitted an affidavit that it would cost the department $6,614 per year to cover for Balint taking her Sabbath off. His calculation is based on the assumption that she would have to be replaced by a senior person for eight hours every week, who would then get overtime. In addition to the financial burden, he was concerned about "increased possibility of officer burn-out and potential increased risk of injury due to the long continuous stretch of working hours."

Possibly things would not turn out to be as bad as Lieutenant Dimit and Chief Deputy Callahan feared if they accommodated Ms. Balint, but their evidence is uncontradicted and establishes more than a *de minimis* cost, so that should be the end of the case. Even if accommodation were possible, it is plain and uncontroverted that the department would, at the least, have to: (1) survey the deputies to see whether any of them wanted to split their days off; (2) prepare new charts for each month remaining in the six-month period if anyone did; (3) analyze whether the new arrangement would create any legal problems under the collective bargaining agreement or the wage and hour laws; (4) pay any overtime required; (5) deal with any unforeseeable problems that arise from an en-

tirely new way to allocate work. That generates a great deal of trouble, risk and possible expense. The six month shift arrangement would be disrupted. An office might voluntarily go to all this trouble to accommodate a long-time well-regarded employee, but creating a new system of allocating shifts and redoing everything in accord with it if someone volunteered to split weekends is a lot to impose on an office for someone who has never worked there. Considering that staffing was already half again as heavy for the Friday and Saturday night shifts, and considering that senior deputies tried to avoid working Friday and Saturday nights because of the large number of what Chief Deputy Callahan called "dysfunctional" bookings those nights, efforts to try to accommodate Balint were likely to be a waste of time. On this record, the majority errs by requiring the jail to make these burdensome efforts.

The reason the majority errs, I think, is underestimation of the force of a seniority system. The statute says that an employer may not "discriminate against" a person because of that person's religion, and defines religion to include all aspects of practice. *See* 42 U.S.C. § 2000e(j). An employer is required to accommodate the worker "unless [the] employer demonstrates that he is unable to reasonably accommodate ... without undue hardship." 42 U.S.C. § 2000e–2(a)(1), 2000e(j). But then Congress trumped this provision with a "notwithstanding" provision. The "notwithstanding" provision says that an employer can impose different terms of employment pursuant to a bona fide seniority system without violating the statute, so long as the seniority system is not the result of an intention to discriminate. Choosing which provision controls if there is a conflict is easy. Congress wrote that the seniority provision controls "[n]otwithstanding any other provision of this subchapter," 42 U.S.C. § 2000e–2(h), which includes the religious accommodation language.

The facts in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), are analogous in mate-

rial respects to the facts in the case at bar. That case held that further efforts to accommodate were not required. The Court in that case discussed TWA's efforts to accommodate, but it did not say that such efforts were necessary. TWA tried to work with the union on an accommodation, but the union had turned down TWA's request for an exception to the seniority system for shift allocation in the collective bargaining agreement. *See id.* at 77–78, 97 S.Ct. 2264. During the *Hardison* litigation, the district court thought TWA's efforts were sufficient, but the circuit court, which was reversed, did not. The circuit court erroneously opined that TWA ought to look into a shorter work week or a swap with other employees to cover Hardison's Sabbath shift, very much as we have required further efforts in the case at bar.

The Court said that the emphasis of the statute was that "similarly situated employees are not to be treated differently solely because they differ with respect to race, color, religion, sex, or national origin." *Id.* at 71, 97 S.Ct. 2264. The Court said that a seniority system is itself "a significant accommodation," because "the seniority system represents a neutral way of minimizing the number of occasions when an employee must work on a day that he would prefer to have off." *Id.* at 78, 97 S.Ct. 2264. The Court pointed out that if it allocated days off in accord with employees' religious needs instead of using a neutral system, "it could have done so only at the expense of others who had strong, but perhaps nonreligious, reasons for not working on weekends." *Id.* at 81, 97 S.Ct. 2264.

The Court explained that the accommodation language was found in the definitions section of the statute, but the seniority provision was in the operational language, stating what an employer could not do. The "unmistakable purpose" of the seniority language was to "make clear that the routine application of a bona fide seniority system would not be unlawful." *Id.* at 82, 97 S.Ct. 2264. "Thus, absent a discriminatory purpose, the operation of a seniority system cannot be an unlawful employment practice even if the system has some discriminatory consequences." *Id.*

This plain holding in *Hardison* means that even if a bona fide seniority system has the effect of "discriminating against" (in the special and limited sense of not making special accommodation for) an employee's religious needs, that discrimination is legal. The Court went so far as to hold that the statutory term "undue hardship" was satisfied if the employer were required to "bear more than a *de minimis* cost." *Id.* at 84, 97 S.Ct. 2264. The Court explained that to impose more than a *de minimis* cost on the employer "would involve unequal treatment of employees on the basis of their religion," as, for example, choosing which employees would enjoy the benefit of additional costs "on the basis of [their] religious beliefs." *Id.* "In the absence of clear statutory language or legislative history to the contrary, we will not readily construe the statute to require an employer to discriminate against some employees in order to enable others to observe their Sabbath." *Id.* at 85, 97 S.Ct. 2264.

One of America's great achievements has been to make an individual's religion irrelevant to how the law requires people and institutions to treat him. As *Hardison* points out, a religiously neutral seniority system for allocating the better shifts at a workplace is itself a means of accommodating religious preferences. It means that employees can accommodate their own religious needs to the extent that their seniority and others' preferences permit, by choosing the shifts and days off they need to practice their religions. *Hardison* points out a significant concern if the law requires too much accommodation of religious preferences. Religious accommodation becomes religious discrimination, if some people are put in a better position than others because of their religion. I can think of few Establishment Clause issues that would matter more to people than whether the government makes them work overtime or during a shift when they want to be home with

their families, because someone more religious, or with a different religion, wants to take the time off for religious purposes. Ordinary civility, as well as the definition of religion in the statute, compel *de minimis* accommodation to people's diverse religious needs. Religious toleration is not going to disappear if we construe the law to require more, but there is no reason to strain toleration by a construction that requires significantly more expense and trouble to be undertaken in the workplace for some people than others, on account of their religions. In this case, even if the jail could find someone to split their weekend into noncontiguous days off and work the undesirable weekend time Balint needed for her Sabbath, looking for that person would take a considerable amount of trouble and would conflict with the well-established neutral seniority system, and finding one would involve considerable administrative effort and potential overtime expense. As a matter of law, this accommodation would therefore be, as the district court held, "more than a *de minimis* cost," so the employer did not have to bear it.