**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

              v.

FERNANDO ARANGO, AKA
Fernando Arango-Villegas,
              *Defendant-Appellant.*

No. 10-15821

D.C. No.
4:09-cv-00178-DCB

OPINION

Appeal from the United States District Court
for the District of Arizona
David C. Bury, District Judge, Presiding

Argued and Submitted
April 14, 2011—Pasadena, California

Filed January 12, 2012

Before: Kim McLane Wardlaw, Jay S. Bybee, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Wardlaw

## COUNSEL

Charles Lifland, Sabrina H. Strong, and Shaun M. Simmons, O'Melveny & Myers LLP, Los Angeles, California, for the appellant.

Tony West, Assistant Attorney Genera; Joshua E.T. Braunstein, Assistant Director Office of Immigration Litigation; and

Kristen L. Daubler, Trial Attorney, Office of Immigration Litigation, Washington, D.C., for the appellee.

## OPINION

WARDLAW, Circuit Judge:

In 1989, Fernando Arango was naturalized as a United States citizen. Twenty years later, in 2009, the United States instituted this action in Arizona district court to strip Arango of his citizenship. The complaint alleged that (1) Arango unlawfully procured his citizenship, and (2) Arango misrepresented and concealed material facts during the naturalization process.

The district court rejected Arango's argument that his incarceration in a federal prison in the Central District of California at the time the government filed its complaint meant that venue was improper in the District of Arizona. The district court then granted the government's motion for summary judgment, concluding that because Arango's Lawful Permanent Resident (LPR) status was unlawfully obtained, there was no material issue of fact as to whether he had procured his citizenship unlawfully.

Although it is undisputed that Arango acquired his LPR status on the basis of a fraudulent marriage, Arango adduced evidence that he had entered into a cooperation agreement with the Immigration and Naturalization Service (INS) permitting him to retain his status as an LPR and to naturalize. The district court improperly weighed the evidence in the record, however, and concluded that such a cooperation agreement did not exist. Because there are genuine issues of material fact as to whether the INS entered into an agreement permitting Arango to retain his LPR status and to naturalize in exchange for cooperating in the investigation of a fraudu-

lent marriage operation, summary judgment was improper, and we reverse.

Because the district court did not permit Arango to rebut the presumption that his place of residence remained where he lived prior to his incarceration, we also vacate the denial of Arango's motion to dismiss the complaint for improper venue, and remand with instructions for the district court to allow Arango to argue that his residence is now his place of incarceration.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Arango is a native of Colombia who was admitted to the United States as an LPR in 1980. He acquired this status through a fraudulent marriage to a United States citizen arranged by a marriage broker, Miguel Diaz. Arango's sister, Amparo Valbuena, worked as a secretary for Diaz, and Valbuena acquired her own LPR status through a sham marriage arranged by him.

In 1982, the INS began to investigate Diaz's fraudulent activities. As part of the investigation, three INS agents met with Valbuena and Arango and obtained sworn affidavits from both that detailed their involvement with the marriage-fraud scheme. In Arango's affidavit, he admitted that he obtained his green card as a result of a sham marriage arranged by Diaz. As a result of Arango and Valbuena's assistance, the INS seized evidence of over 200 immigration applications that were based on sham marriages arranged by Diaz. The INS agents admit that Valbuena was "an important witness" in their case against Diaz, and that they met with her multiple times during the course of their investigation.

Arango asserts that the INS agents promised both him and his sister that, in exchange for their cooperation with the investigation, their immigration status would be secure, and that both would be permitted to naturalize. Both Arango and

Valbuena remained LPRs and naturalized without any complications. Valbuena naturalized in 1984, and Arango naturalized in 1989. Arango later became a U.S. Customs Border Protection Officer in Arizona.

In 2005, Arango was arrested on unrelated federal drug charges. After pleading guilty, he began to serve his sentence at the Federal Correctional Institution in San Pedro, California. In 2009, the Department of Justice filed a civil action in the District of Arizona to revoke Arango's citizenship pursuant to Section 340 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1451. The complaint alleged that Arango's citizenship should be revoked because (1) his citizenship was procured unlawfully as his fraudulent marriage meant that he was never lawfully admitted as an LPR, and (2) Arango misrepresented and concealed material facts regarding his participation in the marriage-fraud scheme during the naturalization process.

Arango argued that venue was improper in the District of Arizona because he had been living in California since his incarceration in San Pedro, California in May of 2007, and he retained no ties to Arizona. The district court disagreed, concluding that Arango's last known residence was Arizona and that "a person does not acquire a domicil while imprisoned."

Opposing the government's motion for summary judgment, Arango submitted a sworn declaration stating that he had entered into a cooperation agreement with INS that permitted him to retain his LPR status and to naturalize in exchange for his assistance with the agency's investigation into the marriage-fraud scheme. Arango also swore that he had not misrepresented or concealed any facts during the naturalization process because he had reasonably assumed that 1) the INS officer was aware of the contents of his immigration file, and (2) his 1982 affidavit and evidence of the cooperation agreement was in his file. Arango also submitted translated emails from his sister that suggested that the siblings had

entered into some type of cooperation agreement with the INS. The government's evidence in support of summary judgment included (1) declarations denying the existence of an agreement from the INS agents who met with Arango and Valbuena in 1982; (2) declarations from Valbuena stating that she was not aware of an agreement between INS and her brother; and (3) a declaration from the INS agent who conducted Arango's 1989 naturalization interview indicating that, while she could not remember meeting with Arango, she would not have granted his naturalization application if he had disclosed information about his sham marriage during his interview.

Granting the government's motion for summary judgment,[1] the court concluded that "the Government provides clear, convincing, and unequivocal evidence that leaves no issue in doubt that Defendant Arango, a naturalized citizen, obtained his citizenship illegally."

## II.   JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over Arango's timely appeal under 28 U.S.C. § 1291, and we review the district court's grant of summary judgment de novo. *See Balint v. Carson City*, 180 F.3d 1047, 1050 (9th Cir. 1999) (en banc). We must determine whether the district court applied the substantive law correctly and whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact. *Id.*

We review the district court's determination as to proper venue de novo. *United States v. Childs*, 5 F.3d 1328, 1331 (9th Cir. 1993).

---

[1]The district court also denied Arango's request to conduct additional discovery under former Federal Rule of Civil Procedure 56(f). Because we reverse the grant of summary judgment, we do not reach Arango's argument that the district court abused its discretion in denying this motion.

## III.  DISCUSSION

### A.  Summary Judgment

Summary judgment is appropriate only if there are no genuine issues of material fact, entitling the moving party to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Although "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," *id.* at 247-48, summary judgment is not warranted if a "reasonable jury could return a verdict for the nonmoving party," *id.* at 248.

**[1]** In a denaturalization proceeding, the government bears the "heavy burden" of providing "clear, unequivocal, and convincing" evidence that citizenship should be revoked. *United States v. Dang*, 488 F.3d 1135, 1139 (9th Cir. 2007) (quoting *Fedorenko v. United States*, 449 U.S. 490, 505 (1981)). The government's evidence justifying denaturalization must "not leave the issue in doubt." *Id.* (quoting *Fedorenko*, 499 U.S. at 505). As the Supreme Court has recognized, "the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions. . . ." *Anderson*, 477 U.S. at 255. Thus, summary judgment for the government in a denaturalization proceeding is warranted in narrow circumstances: if, viewing the evidence in the light most favorable to the naturalized citizen, there is no genuine issue of material fact as to whether clear, unequivocal, and convincing evidence supports denaturalization.

**[2]** The government bears the burden of such a high degree of proof in denaturalization proceedings because of the "importance of the right that is at stake." *Fedorenko*, 449 U.S. at 505-06; *see also id.* at 505 ("[O]nce citizenship has been acquired, its loss can have severe and unsettling consequences."); *Schneiderman v. United States*, 320 U.S. 118, 122 (1943) ("[Citizenship] once conferred should not be taken

away without the clearest sort of justification and proof."). Thus, although summary judgment may be appropriate in certain circumstances, *see*, *e.g.*, *Dang*, 488 F.3d at 1137-38 (affirming district court's grant of summary judgment when the evidence established that the citizen had committed criminal acts precluding a finding of good moral character during the relevant statutory time period, thus warranting denaturalization), it should not be granted lightly.

**[3]** The denaturalization statute, 8 U.S.C. § 1451(a), permits the government to revoke citizenship if naturalization was "illegally procured" or "procured by concealment of a material fact or by willful misrepresentation." Although the district court relied exclusively on illegal procurement of citizenship, the government contends that summary judgment was appropriate on either ground. The government argues that: (1) Arango was not a lawful permanent resident at the time he applied for naturalization because of his fraudulent marriage, so his naturalization was illegally procured;[2] and (2) Arango willfully concealed and misrepresented the nature of his marriage in connection with his 1989 naturalization application.

The evidence submitted by Arango, however, created genuine issues of material fact as to whether the government had met its burden of proving by clear, convincing, and unequivocal evidence that Arango was subject to denaturalization on either of these grounds. In deciding whether to grant summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to deter-

---

[2]If Arango was not a lawful permanent resident at the time of his naturalization because of his fraudulent marriage, then his citizenship was illegally procured. *See Fedorenko*, 449 U.S. at 514 ("[A] naturalized citizen's failure to comply with the statutory prerequisites for naturalization renders his certificate of citizenship revocable as 'illegally procured' under 8 U.S.C. § 1451(a). . . . 8 U.S.C. §§ 1427(a) and 1429[ ] require[ ] an applicant for citizenship to be lawfully admitted to the United States for permanent residence").

mine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. This is because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . ." *Id.* at 255.

## 1.   Illegal Procurement of Citizenship

**[4]** The evidence submitted by Arango created a genuine issue of material fact as to the existence of a cooperation agreement permitting Arango to retain his LPR status and to naturalize. Arango's sworn affidavit in opposition to summary judgment states that his sister entered into an agreement with the INS covering both her and him in exchange for her cooperation with the marriage fraud investigation. The affidavit references an agreement that "pardoned" both Arango and his sister, and the agents' assurances that "this was a closed case" and that "there would be no problem in [Arango's] applying for naturalization." The emails from Valbuena that Arango submitted suggest the existence of a cooperation agreement; in one email Valbuena states that the INS agent told her "that there was no problem for neither you [(Arango)] or me [(his sister)]" in applying for citizenship. Arango's affidavit also questioned why he would have been "allowed to continue to reside in the U.S. after [his] meeting with the INS agents in Manhattan, NY, become a U.S. citizen in 1989, and . . . eventually become employed to work for the government as a border protection agent" if no cooperation agreement existed.

**[5]** Although the government submitted declarations from the INS Agents and Valbuena in an effort to disprove the existence of a cooperation agreement, these declarations do not show that there are no disputed issues of material fact warranting a trial. To the contrary: the conflicting evidence submitted by the government and Arango presented the district court with a genuine dispute of material fact as to the existence of the cooperation agreement. *See Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1038 (9th Cir. 2000)

(regarding conflicting affidavits). These statements were not conclusory, self-serving statements devoid of any factual support. *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."). Arango's affidavit set forth a detailed description of the circumstances surrounding the cooperation agreement. A defendant's sworn statements cannot be disbelieved at the summary judgment stage simply because his statements are in his interest and in conflict with other evidence. *See, e.g.*, *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999) ("Although we can understand the district court's disbelief of [the plaintiff's] assertions in his deposition and sworn declaration, such disbelief cannot support summary judgment."); *McLaughlin v. Liu*, 849 F.2d 1205, 1207-08 (9th Cir. 1988) ("[The defendant's] sworn statements . . . are direct evidence of the central fact in dispute. [He] does not ask that inferences be drawn in his favor, but that his testimony be taken as true. To this he is clearly entitled under *Anderson* . . . .").

Moreover, the circumstantial evidence provides some support for Arango's claim that some type of agreement existed. Despite having a signed affidavit from Arango admitting to marriage fraud, the government did not attempt to revoke Arango's LPR status, and Arango was permitted to naturalize in 1989. His sister was also permitted to remain an LPR and naturalize, despite her more extensive involvement with the marriage fraud scheme. In addition, Arango was later hired as a U.S. Customs Border Protection Officer, even though the INS had direct knowledge of his immigration fraud.

**[6]** The existence of this agreement is a material issue of fact relevant to Arango's alleged illegal procurement of citizenship.[3] The district court, however, improperly weighed the

---

[3]We have previously recognized that the government can be bound by a cooperation agreement in the immigration context. *See Thomas v. INS*,

evidence and gave full credence to the government's version of the events, even though the court was required to view the evidence in the light most favorable to Arango at the summary judgment stage. The district court's weighing of the evidence was improper, especially given the government's heavy burden to provide clear, unequivocal, and convincing evidence that the grounds for denaturalization have been met. Because there existed genuine issues of material fact, summary judgment was not warranted.

### 2. Willful Concealment or Misrepresentation of a Material Fact

The government, however, argues that the record supports affirming the district court's grant of summary judgment on alternative grounds: Arango's alleged willful concealment or misrepresentation of a material fact during the naturalization process.

[7] The Supreme Court has stated that this ground for denaturalization "plainly contains four independent requirements: the naturalized citizen must have misrepresented or concealed some fact, the misrepresentation or concealment must have been willful, the fact must have been material, and the naturalized citizen must have procured citizenship as a result of the misrepresentation or concealment." *Kungys v. United States*, 485 U.S. 759, 767 (1988). We have previously held that an alien who seeks to obtain immigration status by misrepresenting a material fact has done so "willfully" if the misrepresentation was "deliberate and voluntary." *Espinoza-Espinoza v. INS*, 554 F.2d 921, 925 (9th Cir. 1977). The gov-

---

35 F.3d 1332, 1337 (9th Cir. 1994) (holding that the alien "was entitled to performance by the government of its promise" that the government would not oppose any of his motions for relief from deportation). Although the government now argues that, regardless of whether an agreement existed, the INS agents did not have the authority to enter into such an agreement, it provides no legal authority to support this statement or the inferences it wishes us to draw from it.

ernment argues that Arango willfully "misrepresented and concealed the true nature [of] his [prior] 'marriage' " throughout the naturalization process by (1) not disclosing his sham marriage to the INS agent during his naturalization interview, and (2) listing the sham marriage on his naturalization application, which he signed under penalty of perjury.

**[8]** Arango, however, raised genuine issues of material fact as to whether any alleged concealment and misrepresentations were willful. During Arango's interview with the immigration officer, he asked her whether she had reviewed his immigration file, on the assumption that information regarding his prior admissions to INS would be contained in his file. The immigration officer who conducted Arango's naturalization interview does not contradict Arango's version of the events in her declaration. Instead she relies on her own customary practices. She states that, while she cannot remember Arango's interview, she knows that Arango "did not disclose this information" about the prior sham marriage, because she is "certain" that if this information had been disclosed, she would not have permitted his naturalization. Viewing these facts in the light most favorable to Arango, his failure to bring up the topic of his sham marriage, when he reasonably assumed that the immigration officer already knew about it, does not show deliberate or voluntary concealment or misrepresentation.

**[9]** On the naturalization application, Arango indicated that he was married to Vicky Tirado from 1980 to 1984, and he attested to this statement under penalty of perjury. The government argues that this was a material misrepresentation because he was never actually married to Tirado. Even if Arango was not legally married to Tirado during this time period, there are material issues of fact as to whether the misrepresentation was deliberate or voluntary given that Arango's affidavit states that he believed that the INS was aware of the fraudulent nature of this marriage. In fact, if he had failed to mention his marriage to Tirado on his naturalization

application, that would be a willful misrepresentation, because the marriage existed, even if it was later deemed fraudulent. Accordingly, we reject the government's argument that the record supports affirming the district court's grant of summary judgment on these alternative grounds.

## B.  Proper Venue Under INA § 340, 8 U.S.C. § 1451(a)

**[10]** Under the denaturalization statute, "[i]t shall be the duty of the United States attorneys . . . to institute proceedings . . . in the judicial district in which the naturalized citizen may reside at the time of bringing suit." INA § 340(a), 8 U.S.C. § 1451(a). If the naturalized citizen

> does not reside in any judicial district in the United States at the time of bringing such suit, the proceedings may be instituted in the United States District Court for the District of Columbia or in the United States district court in the judicial district in which such person last had his residence.

*Id.* We must decide whether Arango "resided" in Arizona within the meaning of this statute at the time the denaturalization complaint was filed.

**[11]** The Immigration and Nationality Act (INA) defines the term "residence" as "the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent." INA § 101(a)(33), 8 U.S.C. § 1101(a)(33). It is undisputed that at the time the suit was filed, Arango was serving his nine-year prison sentence at a federal correctional institution in San Pedro, California.

The district court, however, relied on a Third Circuit case, *United States v. Stabler*, 169 F.2d 995, 998 (3d Cir. 1948), to conclude that the district of Arizona was the proper venue because "a person does not acquire a domicil while impris-

oned." In this 1948 case, the Third Circuit held that the denaturalization statute's reference to the naturalized citizen's residence requires "some picking out of a place to live in by the individual concerned," and that the forced nature of imprisonment means that a prisoner's residency remains where he lived prior to his incarceration. 169 F.2d at 998. However, at the time that *Stabler* was decided, Congress had yet to define the term "residence" for the purposes of the denaturalization statute.[4] It was not until 1952, with the enactment of the original INA, that the aforementioned general definition of residence (as in the current statute) was made applicable to all immigration provisions, including the denaturalization provision. *See* Immigration and Nationality Act of 1952, Pub. L. 82-414, § 101(a)(33), 66 Stat. 163, 170 (1952). This definition makes clear that "intent" has no bearing on "residency" when applying the denaturalization statute's venue provision, so the district court's reliance on Arango's lack of intent to be incarcerated in California was misplaced.[5]

We previously addressed the denaturalization statute's

---

[4]Although the Nationality Act of 1940 defines "place of residence" as the "place of general abode," this definition is restricted to only certain sections of the Act, and the section permitting denaturalization is not included in the list of affected sections. *See* The Nationality Act of 1940, Pub. L. No. 76-876, § 104, 54 Stat. 1137, 1138 (1940).

[5]Because of the specific definition of "residence" within the INA, we are unpersuaded by the government's reliance on *Cohen v. United States*, 297 F.2d 760 (9th Cir. 1962), for the proposition that "[o]ne does not change his residence to the prison by virtue of his being incarcerated there," 297 F.2d at 774. *Cohen* addresses whether it was error to send the petitioner's tax assessment notices to the petitioner's last known address, when the tax commissioner knew that the petitioner was incarcerated at the time the notice was sent. *Id.* at 771. The panel found that sending the notice to the petitioner's last known address was adequate, given that the tax assessment was for the joint liability of the petitioner and his wife, and the government had no knowledge that the wife had established a separate or different residence from the one on file. *Id.* at 771-74. Thus *Cohen* is not particularly probative on the question of proper venue in denaturalization proceedings.

venue provision in *Stacher v. United States*, 258 F.2d 112 (9th Cir. 1958), albeit for a non-incarcerated defendant. In *Stacher*, although the INA's definition of "residence" was not explicitly referenced, the court stated that "there is an essential difference between 'domicile' which generally involves intent, and 'residence' which generally involves an actual place of abode." *Id.* at 116. We concluded that we were not "concerned with 'intent' " under the denaturalization statute's venue provision, and determined that the trial court's findings of fact as to place of residency were not clearly erroneous.[6] *Id.* at 116-17, 119.

Given the INA's specific definition of residence, we must determine Arango's "place of general abode" at the time that the government filed the denaturalization complaint. While an individual's residence under the INA is distinguishable from his domicile[7] because of the lack of concern with intent, this does not necessarily mean that an incarcerated individual is *per se* a resident of his place of incarceration. There is no evidence that Congress intended to adopt such a *per se* rule for incarcerated individuals when defining "residence" under the INA. In fact, the 1952 Senate Judiciary Committee Report

---

[6]The relevant factors the trial court evaluated included the location of the naturalized citizen's business and real estate interests, the address listed on his income tax returns, where he worked, where his car was registered, where he was listed as residing in the telephone directory, and the location of the various hotels and residences where the naturalized citizen stayed during the relevant time period. *Stacher*, 258 F.2d at 116-19 & nn.11-12.

[7]We do not decide whether a prisoner can establish domicile in his place of incarceration for purposes of federal diversity jurisdiction, a question that the Ninth Circuit has yet to address. *Cf. Stifel v. Hopkins*, 477 F.2d 1116, 1124 (6th Cir. 1973) (adopting a rebuttable presumption that a prisoner retains residency in the place where he lived prior to incarceration for the purposes of diversity jurisdiction: "the prisoner . . . should not be precluded from showing that he has developed the intention to be domiciled at the place to which he has been forced to remove"). This appeal presents only the narrow question of proper venue under the denaturalization statute, given the INA's definition of residence.

accompanying the INA explains that the Act's definition of residence "is a codification of judicial constructions of the term 'residence' as expressed by the Supreme Court of the United States in *Savorgnan v. United States*, [338 U.S. 491, 505 (1950)]." S. Rep. No. 82-1137, at 4-5 (1952). The Report then quotes *Savorgnan*'s holding that it is irrelevant, for the purposes of determining whether an individual resided abroad, what her

> intent was on leaving the United States, nor whether, at any later time, it was her intent to have a permanent residence abroad or to have a residence in the United States. . . . The test of such 'residence' is whether, at any time during that period, she did, in fact, have a 'principal dwelling place' or 'place of general abode' abroad. . . . Her intent as to her 'domicile' or as to her 'permanent residence,' as distinguished from her actual 'residence,' 'principal dwelling place,' and 'place of abode,' is not material.

*Id.* at 5 (quoting *Savorgnan*, 338 U.S. at 505). The Senate Report shows that Congress's goal in adopting this definition of residence was to make explicit that one does not have to intend to remain in a place permanently to have "residence" there. Congress did not necessarily intend to prohibit an incarcerated individual from establishing that his "residence" is outside his place of incarceration.

**[12]** The INA's definition of residence requires us to evaluate Arango's "place of general abode," further defined by the INA as his "principal, actual dwelling place in fact." This definition of residence requires more than mere physical presence in a particular location, so Arango's mere presence in the Central District of California at the time the complaint was filed does not establish his residence there. *Cf. Barrios v. Holder*, 581 F.3d 849, 862-65 (9th Cir. 2009) (defining physical presence under the INA as a "state of being, not a state of

mind" that "depends on no legal construct"). The *Oxford English Dictionary* defines an abode, particularly when used in the phrase "place of abode," as "the action of dwelling or living permanently in a place; habitual residence." Oxford Eng. Dictionary, http://www.oed.com/view/Entry/439 (last updated Sept. 2011). This dictionary also defines abode as "a place of ordinary residence; a dwelling place; a house or home," *id.*, and defines a dwelling as "continued, esp. habitual, residence; abode," http://www.oed.com/view/Entry/58767 (last updated Sept. 2011). Although we have yet to interpret the INA's definition of residence, the Second Circuit has interpreted it to mean "an established abode, for personal or business reasons, permanent for a time." *Michael v. INS*, 48 F.3d 657, 663 n.5 (2d Cir. 1995) (quoting *Rosario v. INS*, 962 F.2d 220, 224 (2d Cir. 1992).

One does not usually describe a prison as a "house or home," or as an individual's "place of ordinary residence," and an incarcerated individual has little, if any, control over how permanent or temporary his stay in a particular prison will be. However, an incarcerated individual *does* sleep, eat, and spend all of his time within the prison walls. Furthermore, as Arango argued in his filings before the district court, some incarcerated individuals do not retain any property or personal ties in the judicial district where they lived prior to incarceration. However, the factors bearing on Arango's place of residency were never evaluated by the district court because of the court's erroneous conclusion that the forced nature of Arango's presence in California meant that he was *per se* unable to establish residence in the Central District.

**[13]** Given the specific definition of residence in the INA, we adopt a rebuttable presumption that an incarcerated individual retains residence in the judicial district where he lived prior to incarceration. Residence means something more than mere physical presence, even though intent is irrelevant, and an individual who is involuntarily incarcerated ordinarily retains a "principal, actual dwelling place" elsewhere. How-

ever, an incarcerated individual should be permitted to rebut this presumption by showing that the prison has become his "principal, actual dwelling place." Here, Arango sought to establish that his place of residence at the time the complaint was filed was his place of incarceration because he did not retain any "home [in], family [in], or contacts with the State of Arizona." However, the district court applied a *per se* rule that improperly precluded Arango from establishing that his residence was in the Central District of California at the time the complaint was filed.[8]

[14] If an incarcerated individual seeks to rebut the presumption that he retains residence in the district where he lived prior to incarceration, the fact-based inquiry referenced in *Stacher* sets forth the correct approach for evaluating his place of residency. Arango may be able to establish that he resided in the Central District of California when the denaturalization complaint was filed by adducing evidence as to whether he owned or rented a home in that judicial district, where he paid taxes, where any car was registered and licensed, the length of his overall prison sentence, the length of time he had been imprisoned in the Central District, where his possessions were located, and where his family members resided. *See Stacher*, 258 F.2d at 116-19 & nn.11-12. These

---

[8]We note that a *per se* rule in the other direction, holding that an incarcerated individual's place of residence is always his place of incarceration, could permit forum shopping by the government. Because the government has the power to transfer prisoners within the federal prison system, a *per se* rule would permit the government to transfer a federal prisoner to the government's favored judicial district prior to instituting denaturalization proceedings. We have expressed our concern with adopting a rule that would facilitate forum shopping by the government in analogous circumstances. *See United States v. Hernandez*, 189 F.3d 785, 791 (9th Cir. 1999) (rejecting the argument that the government can file charges for illegal reentry after prior deportation in any judicial district where a defendant is incarcerated and noting that accepting this argument "would produce unfair and absurd results. . . . [A] deported alien who was moved around the country to various penal institutions could be prosecuted, at the government's option, in any of the districts where the alien set foot.").

factors are not exhaustive; different factors bearing on the place of actual abode may emerge as determinative. We note that if an individual rebuts the presumption that he retains residence in the district where he lived prior to incarceration, but cannot establish that his residence is in his district of incarceration, the district court may conclude under the statute that the prisoner did "not reside in any judicial district in the United States" when the complaint was filed. 8 U.S.C. § 1451(a). The denaturalization statute then permits the government to file suit in "the United States District Court for the District of Columbia or in the United States district court in the judicial district in which such person last had his residence." *Id.*

**[15]** Because the INA makes clear that the term "residence" refers to one's principal dwelling place, without regard to intent, we reverse the district court's ruling that venue was proper in the district of Arizona. On remand, if Arango chooses to attempt to rebut the presumption that his residence was in Arizona, the district court must make a factual finding as to Arango's "principal, actual dwelling place in fact, without regard to intent," INA § 101(a)(33), 8 U.S.C. § 1101(a)(33), at the time the complaint was filed.

## IV.   CONCLUSION

The district court improperly weighed the evidence in concluding that there were no genuine issues of material fact as to whether the government could strip Arango of his citizenship. The existence and nature of the cooperation agreement were the subjects of pending FOIA requests, and further evidence should have been allowed. Because of the importance of citizenship, which in turn confers significant rights and responsibilities, the government bears a heavy burden when it seeks to take away an individual's citizenship. We also vacate the district court's denial of Arango's motion to dismiss for improper venue, and remand with instructions that the district court conduct the proper inquiry consistent with the INA § 101(a)(33), 8 U.S.C. § 1101(a)(33).

**REVERSED in part, VACATED in part, AND REMANDED.**