**WESTERN CENTER FOR JOURNAL-ISM, d/b/a Western Journalism Center, Plaintiff–Appellant,**

v.

**Thomas CEDERQUIST, and Margaret Milner Richardson, Defendants–Appellees.**

No. 99–35377.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 5, 2000

Filed Dec. 20, 2000

Larry Klayman, Washington D.C., for the plaintiff-appellant.

Joan I. Oppenheimer, Tax Division, U.S. Department of Justice, Washington, D.C., for the defendants-appellees.

Before: REINHARDT, BRUNETTI and RYMER, Circuit Judges.

PER CURIAM Opinion; Concurrence by Judge REINHARDT

PER CURIAM:

The plaintiff in this case, Western Center for Journalism, d/b/a/ Western Journalism Center (WJC), is a tax exempt media foundation that specializes in investigative journalism. WJC alleges that the defendants, two officers of the Internal Revenue Service (IRS), conducted an audit to review its tax-exempt status in order to retaliate against it for its First Amendment activity. The defendants moved to dismiss the matter, or in the alternative, for summary judgment, and the district court granted the motion to dismiss and entered a judgment for the defendants. We affirm the judgment, on the ground that the plaintiff's complaint was not filed within the period authorized by the applicable statute of limitations.

## I. BACKGROUND

When reviewing motions to dismiss, we must "accept all factual allegations of the complaint as true and draw all reasonable inferences in favor of the nonmoving party," which is WJC. *Tworivers v. Lewis,* 174 F.3d 987, 991 (9th Cir.1999). Similarly, when we review motions for summary judgment, we consider the facts in the light most favorable to the non-moving party. *See Balint v. Carson City, Nevada,* 180 F.3d 1047, 1050 (9th Cir.1999) (en banc).[1] Therefore, we present the facts below from WJC's perspective. We need not, and do not, speculate as to the plausibility of WJC's allegations, because we need only consider whether, even if they are correct, WJC is entitled to prevail in this action.

The dispute arose at a time when the Clinton Administration was under heavy attack from conservative political forces, including some media outlets. The Whitewater controversy had erupted and was being vigorously pursued. Tensions in Washington, D.C. were high and each side suspected the other of multifarious illicit deeds. Accusations ranged from murder, to sexual misconduct to unlawful real estate transactions. Partisans of the Administration suspected the existence of a "vast right-wing conspiracy" designed to bring down the Presidency through false accusations. It was in that context that WJC apparently drew the attention of some in the White House.

WJC is a controversial media organization that funded an investigative journalist's pursuit of the answer to "significant problems" concerning the death of Vincent Foster. It claims that it was identified in an internal White House report, entitled "Communication Stream of Conspiracy Commerce," as part of the process through which the "right wing" conveys "fringe" stories to the mainstream media. In July 1996, WJC learned that the IRS was auditing it for the 1995 tax year to determine whether it properly was classified as a tax-exempt organization. Later that year, WJC claims, an internal memorandum written by a White House official became public that identified WJC as an organization to be monitored. After learning of this memorandum, WJC believed that the IRS was auditing its tax status in retaliation for its journalism; on October 22,

---

1. The facts we consider when reviewing motions to dismiss and motions for summary judgment differ in one important respect. As to the former, we consider only the facts alleged in the complaint and in any documents appended thereto. *See National Ass'n for the Advancement of Psychoanalysis v. California Bd. of Psychology,* 228 F.3d 1043, 1049 (9th Cir.2000). As to the latter, we consider all evidence in the record, and with regard to any disputed facts, we assume that the non-moving party's factual allegations are correct. *Balint,* 180 F.3d at 1050.

1996, WJC's founder, Joseph Farah, published an op-ed piece in the *Wall Street Journal* postulating that "the unconstitutional harassment of [WJC] is a smoking gun that proves that the White House is manipulating the IRS for political purposes." A year and a half later, on May 13, 1998, WJC filed this action against two Internal Revenue Service (IRS) officials: Thomas Cederquist, the IRS agent assigned to the WJC audit, and Margaret Milner Richardson, Commissioner of the IRS from May 1993 through May 1997.

As part of the audit, Agent Cederquist sent WJC extensive document requests, which included requests for information concerning the process through which WJC selected its investigative reporters and the topics to be probed. WJC alleges that on two occasions, Cederquist made statements indicating that the tax audit was in retaliation for WJC's journalism. While interviewing WJC's accountant, Cederquist was asked by him why he was requesting certain materials. According to WJC, he replied "Look, this is a political case and the decision is going to be made at the national level." WJC claims Cederquist told the accountant that WJC exceeded its authority by publishing information during an election year that was unfavorable to the President, and that he "made reference to the 'political' nature of the audit."

Furthermore, WJC claims that when it went public concerning the retaliatory tax audit in October 1996, the IRS enlarged its review. In December 1996, Cederquist informed WJC that the audit would include the 1994 tax year as well as the 1995 tax year, and over the next few months, WJC learned that its two largest individual charitable donors were also being audited by the IRS.

According to WJC, in February 1997, IRS Commissioner Margaret Milner Richardson, who WJC claims is a friend of the First Lady, announced her resignation, and her last day working at the IRS was May 23, 1997. WJC does not specifically allege that the resignation was in any way related to this case (or, for that matter, that it had anything to do with politically motivated tax audits). In an uncontradicted affidavit, Richardson declares that she had no role whatsoever in the WJC audit, and that she had never heard of WJC until its founder published his op-ed piece in the *Wall Street Journal.* Furthermore, she declares that the IRS has no policy of undertaking politically inspired or retaliatory tax audits.

On April 29, 1997, the IRS reassigned the audit from Cederquist to Agent Grisso, and Grisso conducted a two-day examination of documentation at WJC's offices on April 30 and May 1.[2] Cederquist was present on the first day but did not accompany Grisso on the second day. WJC's complaint states that before he left on May 1, Grisso said:

> he did not understand why so much time and energy had been devoted to the WJC audit because "there was nothing there." Agent Grisso advised [WJC] that he would recommend that a "no change" letter be issued.

WJC does not allege that any tortious conduct took place after Grisso was assigned to the case, and, according to WJC, later that month, on May 28, 1997, Grisso issued a report recommending that WJC's tax-exempt status be continued.

WJC seeks damages in excess of $10 million, claiming that Cederquist and Richardson violated its First and Fourth Amendment rights by conducting a politically-motivated tax audit, and that consistent with *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), it is entitled to compensation. The defendants subsequently filed a motion to

---

**2.** WJC did not dispute the government assertions in district court that the audit took place on April 30 and May 1.

dismiss, or, in the alternative, summary judgment, arguing that: 1) the complaint failed to state a claim under *Bivens;* 2) the action was time-barred; and 3) they were entitled to qualified immunity from suit. The district court granted the defendants' motion to dismiss on the first ground, and this appeal follows.

## II. ANALYSIS

### A. *Availability of a Bivens Remedy*

The district court granted the defendants' motion to dismiss on the theory that the complaint did not state a cause of action under *Bivens.* According to the district court, because the Internal Revenue Code (IRC) contains an extensive remedial scheme for taxpayers, "a *Bivens* action is unavailable." WJC argues on appeal that a *Bivens* remedy is available because it is the only way that WJC can be compensated for its injuries.

■ *Bivens* provides that federal courts have the inherent authority to award damages against federal officials to compensate plaintiffs for violations of their constitutional rights. *Bivens,* 403 U.S. at 394, 91 S.Ct. 1999; *see Carlson v. Green,* 446 U.S. 14, 23, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (authorizing *Bivens* remedy to compensate for constitutional injury even though state tort law and Federal Tort Claims Act authorized award of damages caused by same conduct). However, *Bivens* remedies are not available to compensate plaintiffs for all constitutional torts committed by federal officials. One circumstance in which a *Bivens* remedy is unavailable is when "Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur" in the course of adminis-

tering a federal program. *Schweiker v. Chilicky,* 487 U.S. 412, 423, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988).[3]

It is a question of first impression in this Circuit whether or not a *Bivens* remedy is available to compensate a non-profit organization for a retaliatory tax audit to determine the entity's tax status. In this case, however, we need not determine whether a *Bivens* remedy is available for the type of violation at issue because, as we explain below, we must affirm the district court on the ground that WJC's complaint was not filed within the time permitted by the statute of limitations.

### B. *Statute of Limitations*

■ The district court did not consider the defendants' alternative argument that the complaint is barred by the statute of limitations. There is no dispute that the appropriate statute of limitations period in this matter is one year. *See Van Strum v. Lawn,* 940 F.2d 406, 408–10 (9th Cir.1991) (state's personal injury statute of limitations applies in *Bivens* actions); Cal.Civ. Proc.Code § 340(3) (one year statute of limitations for personal injury actions). While the statute of limitations period is derived from state law, federal law determines when the statute of limitations period accrues. *See Compton v. Ide,* 732 F.2d 1429, 1432 (9th Cir.1984), *abrogated on other grounds, Agency Holding Corp. v. Malley–Duff & Assoc., Inc.,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). A *Bivens* claim accrues when the plaintiff knows or has reason to know of the injury. *See Bagley v. CMC Real Estate Corp.,* 923 F.2d 758, 761–62 (9th Cir.1991).

■ Cederquist and Richardson argue that the accrual date is October 22, 1996, when Farah's op-ed piece was published,

---

**3.** The Supreme Court has recognized two other circumstances when *Bivens* remedies are not available. First, when there are "special factors counseling hesitation in the absence of affirmative action by Congress," a *Bivens* action generally will not be inferred. *Carlson,* 446 U.S. at 18, 100 S.Ct. 1468 (internal citation omitted); *see Chappell v. Wallace,* 462

U.S. 296, 304, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (when the plaintiff is a soldier in the military, special factors counsel hesitation). Second, if Congress specifically forecloses such relief, then courts cannot judicially create a remedy. *Carlson,* 446 U.S. at 18–19, 100 S.Ct. 1468. Neither of these exceptions applies in this case.

while WJC contends that it is at the earliest May 28, 1997, the date when the results of Grisso's report became known. We agree with Cederquist and Richardson that WJC's claim accrued no later than October 22, 1996. The gravamen of WJC's action is that the audit (whether or not it uncovered anything) was in retaliation for the exercise of First Amendment rights. Farrah's Wall Street Journal article so alleged. Therefore, WJC knew of its injury by October 22, 1996, and filed this action more than one year later (May 13, 1998).

▪ WJC contends that even if its action did accrue October 22, 1996, still Cederquist and Richardson engaged in a continuing violation against it, which would bring otherwise time-barred conduct within the statute of limitations period. For a continuing violation to be established, a plaintiff must show "a series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during the limitations period." *Green v. Los Angeles County Superintendent of Schools,* 883 F.2d 1472, 1480 (9th Cir.1989) (internal citation omitted). In this case, whether or not the defendants' actions, from the commencement of the audit until WJC was notified that it would end, were "related," none of the acts falls within the statute of limitations period. In other words, no culpable conduct occurred following May 13, 1997.

Cederquist's last day working on the WJC audit was April 30, 1997, and WJC does not allege that he took any actions with regard to the case after that point. On May 1, 1997, Grisso took over the audit, and on that date informed WJC that "there was nothing there," and that he would advise against withdrawal of WJC's tax-exempt status. On May 1, 1997, then, even if there had been a policy or practice of auditing WJC in retaliation for its jour-

nalistic endeavors, WJC was notified that the policy or practice had stopped, at least with respect to WJC. Moreover, WJC does not allege that the IRS or Richardson took any action contrary to WJC's interests after May 1. Its action is therefore time-barred. *See Gutowsky v. County of Placer,* 108 F.3d 256, 259 (9th Cir.1997) (continuing violation caused by discriminatory policy ends when the policy is changed).

▪ WJC argues that the continuing tort did not end until it became aware of the full nature of the tort, and refers specifically to the fact that it was not until October 1997 that it gained important information about the audit in response to a Freedom of Information Act request. However, as long as a plaintiff has notice of the wrongful conduct, "it is not necessary that [it] have knowledge of all the details or all of the persons involved in order for [the] cause of action to accrue." *Compton,* 732 F.2d at 1433. It is clear that WJC had sufficient notice of the allegedly wrongful conduct as early as October 22, 1996, when its founder published the op-ed piece in the *Wall Street Journal* criticizing the IRS for its investigation of WJC. Therefore, its contention that the statute of limitations period only began in October 1997 is without merit.

▪ The district court, without reaching the statute of limitations issue, entered judgment in favor of the defendants after dismissing the complaint with prejudice for failure to state a claim. This court may affirm the judgment on grounds on which the district court has not ruled. *See United States v. Arthur Young & Co.,* 465 U.S. 805, 814 n. 12, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984). Because WJC does not dispute that the last field audit took place on April 30 and May 1, which is not within the period of limitations, we affirm the judgment dismissing the action on the ground that, whether or not a *Bivens* remedy is available, WJC's action is time-barred.[4]

---

4. Given this disposition, we need not consider whether Richardson and Cederquist are enti-

tled to qualified immunity.

## III. CONCLUSION

WJC did not file its complaint until more than a year after it was informed by Agent Grisso of his conclusions regarding the audit. There is no allegation that the IRS took any action adverse to WJC after that time. To the contrary, the record reflects that the only action that the IRS subsequently took was to formalize Grisso's favorable report. Therefore, the action is barred by the statute of limitations. For that reason, we affirm the district court's order dismissing the complaint with prejudice, and entering judgment for the defendants.

AFFIRMED.

REINHARDT, Circuit Judge, concurring:

I concur in the per curiam opinion. I write separately only to express my view on a question we did not reach because we chose to rely on an alternate ground.

The district court dismissed WJC's complaint on the ground that it failed to state a cognizable *Bivens* claim. I conclude that the district court erred in relying on that rationale.

The government contends that a *Bivens* remedy is not available to compensate WJC for the alleged constitutional injuries it incurred as a result of a tax audit that WJC asserts was launched to harass it for exercising its First Amendment rights. WJC contends that the audit was ordered in retaliation for its funding of investigative journalism critical of the Administration. Assuming (as we must) that the facts as stated by WJC are correct,[1] I conclude, contrary to the district court, that a *Bivens* remedy is available.

The government claims that this case falls within the exception to *Bivens* recognized in *Schweiker v. Chilicky,* 487 U.S. 412, 423, 108 S.Ct. 2460, 101 L.Ed.2d 370

(1988) (holding that no *Bivens* remedy is available when "Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur"). Under its theory, the government would be insulated against liability for its attempt to suppress the type of criticism that forms the very core of speech protected by the First Amendment. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). As a result, those voices it seeks to silence would be without a legal remedy.

The government reads *Schweiker* too broadly. In *Schweiker,* which concerned the denial of Social Security Disability Insurance benefits, after surveying the extensive remedial provisions of the Social Security Act, the Court determined that "Congress ... has not failed to provide meaningful safeguards or remedies for the rights or persons situated as [the plaintiffs] were." *Id.* at 425, 108 S.Ct. 2460. While the Court agreed that the restoration of back benefits afforded by the statute would not *fully* remedy the plaintiffs, it held that the statutory relief sufficed, and therefore it would not judicially create a supplemental form of relief. *Id.* at 428–29, 108 S.Ct. 2460.

The Court reached a similar conclusion in *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). In *Bush,* the plaintiff, a federal employee, alleged that he was demoted for exercising his First Amendment rights by making statements to the press that were critical of the government. *See id.* at 369–70, 103 S.Ct. 2404. He exercised his statutory right to challenge this action before the Civil Service Commission, was reinstated to his previous position, and received back pay. *See id.* at 370–71, 103 S.Ct. 2404. He also sought damages in state court for violation of his First Amendment rights. *See id.* at 371, 103 S.Ct. 2404. On appeal from this

---

1. As made clear in the opinion for the court, for the purposes of our opinions, the facts must be assumed to be as alleged by WJC. The plausibility or lack of plausibility of the factual allegations is not before the court at this stage of the proceeding. *See Tworivers v. Lewis,* 174 F.3d 987, 991 (9th Cir.1999).

second action, the Supreme Court explained that:

> [t]he question is not what remedy the court should provide for a wrong that would otherwise go unredressed. It is whether an elaborate remedial system that had been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue. *Id.* at 388, 103 S.Ct. 2404.

Answering this question in the negative, the Court declined to augment the remedy available to Bush. *See id.* at 390, 103 S.Ct. 2404.

In this case, unlike in *Schweiker* and *Bush*, WJC argues that no relief at all would be available to it, and therefore in the absence of a *Bivens* remedy "the wrong ... would ... go unredressed." *Id.* at 388, 91 S.Ct. 1999. In *Schweiker*, plaintiffs could recover the denied benefits. *See Schweiker*, 487 U.S. at 428, 108 S.Ct. 2460. In *Bush*, the plaintiff could be reinstated and receive back pay. *See Bush*, 462 U.S. at 370–71, 103 S.Ct. 2404. *Schweiker* and *Bush* hold that when Congress affords a remedy for the constitutional violation, even if the remedy does not afford complete relief, a court may not judicially create an additional remedy. Those cases do not, however, stand for the proposition that when Congress has created no remedy at all, a *Bivens* remedy may not be afforded to those whose constitutional rights have been violated simply because Congress affords other remedies for unrelated violations that occur in the course of administering the government program or activity involved.

When considering a factual circumstance materially different from the one presented here, the use of unconstitutional tactics when *collecting* taxes, we held that because the plaintiff has "the right to sue the government for a refund of taxes unlawfully collected," the additional remedy of a *Bivens* action is not also available. *Wages v. IRS*, 915 F.2d 1230, 1235 (9th Cir.1990);

*National Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521, 1532 (10th Cir.1994); *Cameron v. IRS*, 773 F.2d 126, 129 (7th Cir.1985); *cf. Shreiber v. Mastrogiovanni*, 214 F.3d 148, 152 (3d Cir.2000) (no *Bivens* remedy available where IRS officials violated constitutional rights when making a tax assessment). However, unlike in *Wages* and *Shreiber*, in which the Internal Revenue Code (Code) provides a mechanism for the taxpayer to be compensated for the wrongful collection of taxes and the wrongful determination of the amount of taxes owed, in this case, the Code does not authorize any relief (other than a declaratory judgment, *see* 26 U.S.C. § 7428(a)); nor does that Code preclude relief for the type of injury alleged here—harassment by means of a retaliatory audit on account of the expression of one's political views.

If the IRS actually conducts audits of organizations to retaliate against them for exercising their First Amendment right to criticize government officials, courts certainly have the authority to intervene. The *Bivens* remedy is a powerful tool against such governmental abuse, and must be available in appropriate cases.

The Tenth Circuit has explained that, in cases in which the Code does not provide any mechanism for compensation, IRS officers are not shielded from liability simply because the Code contains remedies for other, unrelated violations. *National Commodity & Barter Ass'n*, 31 F.3d at 1530 (*Bivens* remedy against IRS officials proper to redress injury to First Amendment rights caused by seizure of organization's membership lists); *cf. id.* at 1532 (no *Bivens* remedy to redress harm caused by jeopardy assessment, because the Code provides a mechanism to remedy wrongful collection of taxes). I agree with the Tenth Circuit that a *Bivens* remedy is available in First Amendment cases involving the type of IRS harassment alleged here.

For the above reasons I conclude that the district court erred in dismissing

WJC's complaint for failure to state a *Bivens* claim, as well as in failing to dismiss that action because it was barred by the statute of limitations.