**PUBLISHED**

# UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

JUDICIAL WATCH, INCORPORATED,
        *Plaintiff-Appellant,*

v.

CHARLES ROSSOTTI; UNITED
STATES OF AMERICA; DONNA DORSEY;
M. PETER BRESLAN; WAYNE HAMPEL;          No. 02-1413
STEVEN T. MILLER;
DEPARTMENT OF THE TREASURY;
INTERNAL REVENUE SERVICE,
        *Defendants-Appellees.*

JUDICIAL WATCH, INCORPORATED,
        *Plaintiff-Appellant,*

v.

CHARLES ROSSOTTI; UNITED
STATES OF AMERICA; DONNA DORSEY;
M. PETER BRESLAN; WAYNE HAMPEL;          No. 02-1462
STEVEN T. MILLER;
DEPARTMENT OF THE TREASURY;
INTERNAL REVENUE SERVICE,
        *Defendants-Appellees.*

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, Senior District Judge.
(CA-01-2672-WMN)

Argued: December 3, 2002

Decided: January 24, 2003

Before NIEMEYER, LUTTIG, and MOTZ, Circuit Judges.

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Niemeyer and Judge Luttig joined.

## COUNSEL

**ARGUED:** David Barmak, MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO, P.C., Reston, Virginia, for Appellant. Gretchen M. Wolfinger, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Erica Brown, MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO, P.C., Washington, D.C., for Appellant. Eileen J. O'Connor, Assistant Attorney General, Jonathan S. Cohen, Thomas M. DiBiagio, United States Attorney, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

In this interlocutory appeal, Judicial Watch, Incorporated, challenges the district court's dismissal of its claims for injunctive relief and money damages against the Internal Revenue Service (IRS) and certain IRS employees. Judicial Watch contends that the IRS initiated a retaliatory tax audit, intended to punish the organization for its political speech. Because the Anti-Injunction Act bars the requested injunctive relief and the law provides no damages remedy for the wrongs alleged here, we affirm.

I.

Founded in 1994, Judicial Watch describes itself as a "non-partisan legal 'watchdog' organization that relies on the Freedom of Information Act ("FOIA"), the civil discovery process, and court litigation,

among other tools, to protect the American people from, and educate them about, corruption in government and abuses of power, and to enforce the principle that 'no one is above the law'."

Since 1995, Judicial Watch has operated as a tax-exempt, § 501(c)(3) organization. *See* 26 U.S.C.A. § 501(c)(3) (West 2002). The Internal Revenue Code bars such organizations from lobbying. *See id.* (requiring that qualifying organizations refrain from "carrying on propaganda, or otherwise attempting, to influence legislation . . . or interven[ing] in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office"); *see also* 26 U.S.C.A. § 504 (West 2002) (addressing status of organization that fails to qualify for 501(c)(3) exemption because of substantial lobbying or political activities); *Regan v. Taxation with Representation for Washington*, 461 U.S. 540, 551 (1983) (affirming § 501(c)(3) ban on lobbying).

During the late 1990s, Judicial Watch filed a number of lawsuits against President and Mrs. Clinton. On September 28, 1998, in the midst of the impeachment proceedings against President Clinton, Judicial Watch submitted a report entitled "Interim Report: Crimes and Other Offenses Committed by President Bill Clinton Warranting His Impeachment and Removal from Elected Office" ("Interim Report") to members of the House Judiciary Committee. The Interim Report claimed, *inter alia*, "that the Clinton Administration had operated a campaign of retribution and retaliation against its perceived enemies, using politically inspired retaliatory tax audits as a major weapon in that campaign." The Interim Report was subsequently accepted into the Congressional Record and made an official part of the impeachment proceedings in Congress.

Several days later, Judicial Watch received a letter from the IRS, signed by Agent Donna Dorsey, stating that it had been selected for an audit. The letter was accompanied by an IRS Form 4564 Information Document Request, which requested information pertaining to the political affiliations of Judicial Watch directors. After receiving the audit letter, Judicial Watch resisted IRS efforts to proceed with the audit by filing FOIA requests, meeting with IRS officials, refusing IRS document requests, and asserting throughout that the audit constituted politically motivated retaliation.

In July 1999, the IRS informed Judicial Watch that the Service was withdrawing the audit pending an investigation by the Treasury Inspector General for Tax Administration, the independent internal monitor of IRS activities. The IRS contends, and Judicial Watch does not dispute, that the Inspector General then conducted two investigations into the asserted illegitimacy of the audit and found no evidence of impropriety by the IRS or any of the IRS employees involved in the decision to audit Judicial Watch.

Nevertheless, in September 2001, Judicial Watch filed this action in the United States District Court for the District of Maryland against former IRS Commissioner Rossotti, four individual IRS agents (Donna Dorsey, Peter Breslan, Wayne Hampel, and Steven T. Miller), and the United States. In January 2002, Judicial Watch filed an amended complaint, withdrawing its claims against the United States, but adding the Department of the Treasury and the Internal Revenue Service as defendants.

The amended complaint alleges that the audit is "retaliatory, politically-motivated, and unconstitutional," violating Judicial Watch's First Amendment free speech rights, Fifth Amendment due process rights, and Fifth Amendment right to be free of selective prosecution. The amended complaint seeks an injunction against all defendants from proceeding with the audit and compensatory and punitive damages against ex-Commissioner Rossotti and the individual agents. It also includes claims for relief in connection with Judicial Watch's FOIA requests.

In support of its constitutional claims, Judicial Watch alleges that the timing of the audit letter (four days after the Interim Report was made an official part of Congress's impeachment proceedings), the timing of several subsequent IRS document requests pursuant to the audit, and the fact that it received final notice of its exempt status at roughly the same time that it received the audit letter, create a strong inference of retaliatory motive. Similarly, Judicial Watch cites the "extraordinary demand" contained in the IRS Form 4564 Information Document Request that Judicial Watch provide information on the political affiliations of its directors and the alleged refusal of the IRS to respond to Judicial Watch's various FOIA requests as evidence of bad faith and improper motive.

Finally, Judicial Watch refers to comments by various IRS agents that, in its view, suggest a retaliatory motive. These comments include the statement by Agent Dorsey on November 23, 1998 to counsel for Judicial Watch that the audit was a "hot potato"; the query by Agent Breslan to representatives from Judicial Watch at a meeting on January 12, 1999: "What do you expect when you sue the President?"; the asserted concession by Agent Miller that the audit and IRS's failure to respond to Judicial Watch's FOIA requests "had created at least the appearance of a problem"; and statements made during March and April 2000 by Agent Hampel that Judicial Watch was still on the IRS "radar screen."

On January 18, 2002, more than three years after sending the initial audit letter, the IRS served Judicial Watch with an administrative summons pursuant to the audit demanding production of documents within eight business days. Judicial Watch refused to comply with the summons, but instead filed another action in the district court seeking to stay or enjoin any attempt to enforce the summons. The court subsequently consolidated the new action with the original action.

After full briefing, the district court denied Judicial Watch's motion to stay or enjoin the administrative summons and granted the defendants' motion to dismiss all claims. Because the court did not resolve the FOIA claims, Judicial Watch moved for certification of the case for immediate appeal. The district court entered the requested certification order and we, in turn, granted Judicial Watch's petition for interlocutory review. *See* 28 U.S.C.A. § 1292(a)(1) (West 1993).[1]

---

[1]Subsequent to the issuance of the district court's opinion, the Government filed a summons enforcement action in the District Court for the District of Columbia. On December 11, 2002, after extensive briefing and *in camera* review of "all documents relating to [IRS's] motivation and purpose for its proposed audit of Judicial Watch," affidavits from IRS officials and employees involved in the audit, and the reports of two investigations of the audit by the Treasury Inspector General for Tax Administration, the court resolved the action in favor of the United States, concluding that there was "no evidence of political vindictiveness or retaliatory motive." *See United States v. Judicial Watch, Inc.*, Misc. Action No. 02-144 (ESH) (D.D.C. Dec. 11, 2002) slip op. at 3, 9-10. Judicial Watch indicates that it intends to appeal this ruling.

## II.

The district court denied Judicial Watch's request for injunctive relief on the ground that the Anti-Injunction Act (sometimes herein, "the Act"), 26 U.S.C.A. § 7421 (West 2002), deprived it of jurisdiction to grant such relief. We review that decision *de novo*. *Estate of Michael v. M.J. Lullo*, 173 F.3d 503, 506 (4th Cir. 1999).

The Anti-Injunction Act provides in relevant part that:

> no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed.

26 U.S.C.A. § 7421(a) (West 2002).

As the Supreme Court has emphasized, the language of the Act "could scarcely be more explicit," reflecting its overarching objective of protecting "the Government's need to assess and collect taxes as expeditiously as possible with a minimum of pre-enforcement judicial interference." *Bob Jones University v. Simon*, 416 U.S. 725, 736 (1974); *see also Sigmon Coal Co. v. Apfel*, 226 F.3d 291, 299 (4th Cir. 2000) ("The Act has two primary objectives: 'efficient and expeditious collection of taxes with a minimum of preenforcement judicial interference, and protection of the collector from litigation pending a refund suit'." (quoting *United States v. American Friends Serv. Comm.*, 419 U.S. 7, 12 (1974) (*per curiam*))), *aff'd sub nom. Barhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002). The effect of the Act is simple and obvious: courts lack jurisdiction to issue injunctive relief in suits seeking to restrain the assessment or collection of taxes. *See, e.g.*, *Estate of Michael*, 173 F.3d at 506 ("The Anti-Injunction Act withdraws all courts' jurisdiction over suits filed 'for the purpose of restraining the assessment or collection of any tax'.").

Judicial Watch maintains that the Act does not apply to its motion to enjoin the audit (and stay or enjoin enforcement of the administrative summons issued pursuant to the audit) because an audit conducted for unlawful purposes does not constitute "assessment or

collection" of a tax. Alternatively, it argues that even if the Act does apply to its request for injunctive relief, the present action falls within the judicially crafted exceptions to the Act. Both arguments fail.

A.

First, it is clear that the Anti-Injunction Act extends beyond the mere assessment and collection of taxes to embrace other activities, such as an audit to determine tax liability, that may culminate in the assessment or collection of taxes.

In *Bob Jones*, for example, the Supreme Court refused to enjoin the IRS from revoking the plaintiff's § 501(c)(3) status. 416 U.S. at 748-49. Other courts, including this one, have also held that the Act applies broadly to include activities that are intended to or may culminate in the assessment or collection of taxes. *See, e.g.*, *Lowrie v. United States*, 824 F.2d 827, 830 (10th Cir. 1987) ("The statute applies not only to the actual assessment or collection of a tax, but is equally applicable to activities leading up to, and culminating in, such assessment and collection."); *Dickens v. United States*, 671 F.2d 969, 971 (6th Cir. 1982) (stating that the Act "is equally applicable to activities which are intended to or may culminate in the assessment or collection of taxes" (internal quotations marks and citations omitted)); *White v. Boyle*, 538 F.2d 1077, 1080 (4th Cir. 1976) (affirming dismissal of request for injunctive relief regardless of whether the taxpayer "sought to restrain the collection of taxes . . . or to restrain an investigation of his tax liability" (citations omitted)). Clearly, an audit to determine tax liability fits squarely within the category of activities that may culminate in the assessment or collection of taxes.

Judicial Watch attempts to distinguish these cases on the ground that in them the IRS acted on the basis of good faith tax enforcement purposes, while the audit at issue here was, according to Judicial Watch, a product of bad faith non-tax related motives. Judicial Watch further maintains that because these bad faith motives assertedly drove the decision to initiate the audit, enjoining the audit (and any judicial enforcement of the administrative summons) would not constitute an interference with the assessment or collection of taxes.

The initial difficulty with this argument is that, although the amended complaint contains general allegations of retaliatory conduct

by IRS agents based on the factual chronology outlined above, the complaint does not allege that the individual IRS agents even knew that Judicial Watch had filed various lawsuits, much less its Interim Report, explicitly targeting the Clinton administration. Nor does Judicial Watch dispute that the Inspector General conducted two investigations and twice exonerated the individual IRS employees involved in the audit decision.

Moreover, the sworn declaration of Agent Dorsey, which the district court made part of the record after issuance of its decision in this case at the request of Judicial Watch and which Judicial Watch urges us to consider, severely undermines Judicial Watch's general allegations of retaliation. In her declaration, Dorsey, who signed the initial audit letter, states that the decision to audit Judicial Watch was made in December 1997 (more than nine months *before* the impeachment proceedings); that when first assigned the Judicial Watch audit in July 1998 she had never heard of the organization; that, except for an initial instruction to coordinate her work on the audit with IRS District Counsel in Baltimore, she never received any "instructions, directions, indications, or suggestions from anyone to treat Judicial Watch, Inc. differently than any other taxpayers" during the course of her work on the case; that she never had any contact with then-Commissioner Rossotti or his office or with the President or the Vice President, or their offices; and that she did not follow and was not aware of any role that Judicial Watch played in the impeachment of President Clinton.[2] Judicial Watch does not dispute any of these asser-

_____

[2]The district court also permitted Judicial Watch to supplement the record with numerous complaints by citizens to various elected officials regarding Judicial Watch's political activities, and referral of those complaints to the IRS. The citizens assert that based on fundraising materials received from Judicial Watch, they believe that the organization engaged in partisan political activity not permitted of a § 501(c)(3) tax-exempt organization. These materials do not support Judicial Watch's contentions that the IRS or its agents acted improperly. They simply evidence constituent service, which our political system accepts and even applauds. Judicial Watch places particular emphasis on "an August 14, 1998 e-mail" complaint of this sort "from a purported Clinton supporter to President Clinton" and documents indicating that the Office of the President forwarded this e-mail to then IRS-Commissioner Rossotti's

tions. We also can take judicial notice that in its recent decision granting the IRS's summons enforcement request, the district court in the District of Columbia concluded, on the basis of a "voluminous record," that there was "no evidence of political vindictiveness or a retaliatory motive." *United States v. Judicial Watch, Inc.*, Misc. Action No. 02-144 (ESH) (D.D.C. Dec. 11, 2002), slip op. at 2-3. Thus, Judicial Watch's argument that the IRS acted with bad faith motives unrelated to enforcement of the tax law finds little support in the record.

More importantly, Judicial Watch misunderstands the impact of allegations that the IRS acted with bad faith, non-tax related motives. Such allegations do not render the Anti-Injunction Act inapplicable. In *Bob Jones* itself, the taxpayer contended, when seeking to enjoin the IRS, that "the Service's threatened action was outside its lawful authority and would violate petitioner's rights to the free exercise of religion, to free association, and to due process and equal protection of the laws." *Bob Jones*, 416 U.S. at 736. The Supreme Court recognized this "attribution of non-tax-related motives to the Service," but concluded that the attribution "ignore[d] the fact that the [taxpayer] ha[d] not shown that the Service's action was *without an independent basis in the requirements of the Code*." *Id.* at 740 (emphasis added). The Court explained that if the IRS action represents "a good-faith effort to enforce the technical requirements of the tax laws," other additional motives for its actions do not eliminate the prohibition in the Anti-Injunction Act. *Id.* Thus, despite the petitioner's efforts to circumvent the restrictions of the Anti-Injunction Act by attributing a non-tax-related purpose to the IRS's actions, the *Bob Jones* Court concluded that the Act did apply and proceeded to determine if the request for injunctive relief qualified for an exception to the Act. *Id.* at 748-49.

---

office. Supp. Brief of Appellant at 3-4. However, as noted in text above, regardless of the lawfulness of this communication by the President or his office (and Judicial Watch maintains that it violates 26 U.S.C.A. § 7217 (West 2002)) nothing in the record indicates it had any effect on the IRS's decision to audit Judicial Watch. Indeed, according to Agent Dorsey's undisputed sworn statement, the IRS decided to audit Judicial Watch in December 1997 — eight months before the date of the e-mail.

Accordingly, unless Judicial Watch qualifies for one of two exceptions to the Anti-Injunction Act, the district court properly concluded that the Act stripped it of jurisdiction necessary to issue the requested injunctive relief.

B.

The Supreme Court established the first exception to the Act in *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1 (1962), "the capstone to judicial construction of the Act." *Bob Jones*, 416 U.S. at 742. In *Williams Packing*, the taxpayer requested an injunction to prevent the IRS from collecting past due social security and unemployment taxes. Although the Supreme Court reversed a lower court's grant of injunctive relief, the Court held that such actions could proceed, despite the Anti-Injunction Act, if, but only if, the plaintiff could show that (1) "under no circumstances could the Government ultimately prevail," and (2) "equity jurisdiction otherwise exists." *Williams Packing*, 370 U.S. at 7. Moreover, the Court directed that in analyzing the initial factor, a court must determine, "on the basis of the information available to [the Government] at the time of the suit," whether, "under the most liberal view of the law and the facts, the United States cannot establish its claim." *Id.*; *see also Estate of Michael*, 173 F.3d at 506.

Judicial Watch simply cannot establish that "under no circumstances could the Government ultimately prevail." *Williams Packing*, 370 U.S. at 7. Section 501(c)(3) provides an explicit basis for the IRS to investigate Judicial Watch's tax-exempt status and determine if its "political" activities merit a change in its status. As the district court concluded, taking the most liberal view of the law and the facts, it is quite possible (even "plausible") that the IRS initiated and has continued to pursue the audit because it was "legitimately suspicious" that Judicial Watch's "earnest efforts to assist in the impeachment of President Clinton" constituted the sort of "prohibited political activity" not permitted any organization afforded § 501(c)(3) status. As in *Bob Jones*, therefore, regardless of any additional, improper non-tax related purpose, Judicial Watch has not and cannot demonstrate that the IRS action does not reflect, at least in part, "a good faith effort to enforce the technical requirements of the tax laws." *Bob Jones*, 416 U.S. at 740. Thus, without deciding the merits of Judicial Watch's

claims, we must conclude that its contentions "are sufficiently debatable to foreclose any notion that under no circumstances could the Government ultimately prevail." *Id.* at 749.

Nor can Judicial Watch find refuge in the other exception to the Anti-Injunction Act, that created in *South Carolina v. Regan*, 465 U.S. 367, 375 (1984). There, South Carolina sought an injunction against a tax on the ground that a provision of the Code regarding state-issued bonds violated the Constitution. The Supreme Court held that if the Anti-Injunction Act applied, South Carolina would have had to depend on third parties to raise the State's constitutional challenge in their tax refund suits. *Id.* at 379-80. The Court reasoned that the Act could not stand as a barrier to injunctive relief in situations "where . . . Congress has not provided the plaintiff with an alternative legal way to challenge the validity of the tax." *Id.* at 373.[3]

Of course, the basis of the *Regan* exception is *not* whether a plaintiff has access to a legal remedy for the precise harm that it has allegedly suffered, but whether the plaintiff has any access at all to judicial review. As the *Regan* Court explained, "the indicia of congressional intent — the [Anti-Injunction] Act's purposes and the circumstances of its enactment — demonstrate that Congress did not intend the Act to apply where an aggrieved party would be required to depend on the mere possibility of persuading a third party to assert his claims." *Id.* at 381. The Act does apply, however, whenever Congress has provided "an alternative avenue for an aggrieved party to litigate its claims on its own behalf." *Id.*

---

[3]Because of the strong policy animating the Anti-Injunction Act, and the sympathetic, almost unique, facts in *Regan*, courts have construed the *Regan* exception very narrowly, undermining Judicial Watch's efforts to fit its own claims within the confines of this exception. *See, e.g.*, *In re American Bicycle Ass'n*, 895 F.2d 1277, 1281 (9th Cir. 1990) ("Promoting the purpose behind the Act requires a strict construction of any possible exceptions."); *Lewes v. IRS*, 796 F.2d 1433, 1434 (11th Cir. 1986) (refusing to extend the exception because *Regan* "involved the rights of third parties to litigate the tax liability of persons against whom the tax was assessed"); *American Society of Ass'n Executives v. Bentsen*, 848 F. Supp. 245, 250 (D.D.C. 1994) (noting that the exception announced in *Regan* "is a narrow one tailored to the unique factual pattern in that case").

This case differs markedly from *Regan*. Judicial Watch does not challenge the validity of any provision of the Code, but only seeks to avoid an audit to determine its tax liability. Judicial Watch need not depend on third parties to pursue this claim, a fact reflected in its efforts to resist the audit in the summons enforcement proceedings in the District of Columbia. *See supra* n.1. Moreover, the Code also provides that organizations whose exempt status under 501(c)(3) has been denied or revoked can seek declaratory relief. *See* 26 U.S.C.A. § 7428 (West 2002). Although Judicial Watch may not like the avenues Congress has provided for challenging an audit, it simply cannot maintain that it has no avenue for doing so.

In sum, the claims for injunctive relief asserted by Judicial Watch do not fall within the narrow exceptions carved out in *Williams Packing* or *Regan*. Strong policy reasons support this result. Extending the recognized exceptions to the Anti-Injunction Act to include requests for injunctive relief like that of Judicial Watch would threaten a flood of lawsuits brought against the IRS by those seeking to enjoin an audit they believed to be wrongful, creating precisely the kind of judicial interference with the assessment and collection of taxes that the Act was designed to prevent.

### III.

Judicial Watch also contends that the district court erred in dismissing its *Bivens* action for money damages against the individual defendants. *See Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388, 396-97 (1971).[4]

In *Bivens*, the Supreme Court found that the Fourth Amendment contained an implied private cause of action for damages against federal narcotics agents who allegedly conducted an illegal search and seizure. *See Bivens*, 403 U.S. at 397. The Court concluded that it could recognize this new constitutional tort because, although Congress had never provided for such a private right of action, "no

---

[4]The district court concluded that the individual defendants were entitled to qualified immunity on the alleged *Bivens* claims. Because we find no *Bivens* action lies in this case, we do not reach the question of qualified immunity.

explicit congressional declaration" prohibited it, and "no special factors counsel[ed] hesitation [by the Court] in the absence of affirmative action by Congress." *Id.* at 396-97.

In the more than thirty years since *Bivens*, the Court has been very hesitant to imply other private actions for money damages. Indeed, the Court has only recognized two other such actions — one under the Due Process Clause of the Fifth Amendment, *Davis v. Passman*, 442 U.S. 228, 245-49 (1979) (finding *Bivens* remedy for alleged violation of due process rights because of gender discrimination by United States Congressman in terminating petitioner's employment), and one under the Cruel and Unusual Punishment Clause of the Eighth Amendment, *Carlson v. Green*, 446 U.S. 14, 18-23 (1980) (finding *Bivens* remedy for federal prisoner who was allegedly deprived of potentially life-saving treatment in violation of his Eighth Amendment rights). Instead, the Court has directed its attention to cabining the *Bivens* doctrine. *See Correctional Services Corp. v. Malesko*, 122 S. Ct. 515, 520 (2001) ("Since *Carlson* we have consistently refused to extend *Bivens* liability to any new context or new category of defendants.").

The Court's refusal to extend *Bivens* has been especially apparent in cases involving complex statutory schemes in which Congress has considered and created meaningful avenues for redress. Thus, in *Bush v. Lucas*, 462 U.S. 367 (1983), the Court refused to find an implied *Bivens* remedy for federal employees alleging that their supervisors violated their First Amendment rights. Because these claims arose out of a "relationship . . . governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States," the Court concluded that "it would be inappropriate . . . to supplement that regulatory scheme with a new judicial remedy." *Id.* at 368.

Similarly, in *Schweiker v. Chilicky*, 487 U.S. 412 (1988), the Court declined to find a new *Bivens* remedy for claimants whose Social Security disability benefits had been improperly terminated. Given the "elaborate remedial scheme devised by Congress" to deal with the improper denial or termination of disability benefits, the Court saw no reason to tread on congressional prerogatives by creating a new judicial remedy for the particular harm suffered by the claimants. *Id.* at

414. In reviewing the development of *Bivens* jurisprudence, the Court concluded:

> the concept of "special factors counseling hesitation in the absence of affirmative action by Congress" has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent. When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies.

*Id.* at 423. Thus, in *Chilicky*, even though "Congress ha[d] failed to provide for '*complete* relief'" for the disability claimants, the Court refused to create a *Bivens* remedy because Congress had provided some "*meaningful* safeguards or remedies." *Id.* at 425 (emphasis added).

Following these precedents, we too have refused to extend *Bivens*. *See, e.g.*, *Hall v. Clinton*, 235 F.3d 202, 204 (4th Cir. 2000) (declining to create a Fifth Amendment *Bivens* remedy for White House employee because Congress had already established an exclusive statutory remedy); *Zimbelman v. Savage*, 228 F.3d 367, 371 (4th Cir. 2000) (finding that special factor of federal employment counseled against creating a *Bivens* remedy for Air Force personnel alleging unfair termination of employment based on false accusations). In adjudicating claims requesting the creation of new *Bivens* remedies, we have gleaned from the above Supreme Court precedent a three-part test:

> [i]n order for a *Bivens* remedy to be available, a court must determine that (1) Congress has not already provided an exclusive statutory remedy; (2) there are no "special factors counseling hesitation in the absence of affirmative action by Congress"; and (3) there is no "explicit congressional declaration" that money damages not be awarded.

*Hall*, 235 F.3d at 204 (citations omitted). Moreover, we have noted that "[t]he 'special factors' concept 'include[s] an appropriate judicial

deference to indications that congressional inaction has not been inadvertent'." *Id.* (citations omitted). Accordingly, we apply these factors to this case to determine whether Congress has sufficiently attended to the rights and remedies available to taxpayers in the context of the Internal Revenue Code to foreclose judicial creation of additional remedies.

It would be difficult to conceive of a more comprehensive statutory scheme, or one that has received more intense scrutiny from Congress, than the Internal Revenue Code. In constructing this vast and exceedingly complex statutory apparatus, moreover, "Congress has given taxpayers all sorts of rights against an overzealous officialdom." *Cameron v. Internal Revenue Service*, 773 F.2d 126, 129 (7th Cir. 1985); *see also McMillen v. United States*, 960 F.2d 187, 190 (1st Cir. 1991). Thus, the Code provides Judicial Watch with a number of ways to challenge actions of the IRS as well as those of individual agents.

As noted above, in response to an audit or other activities involved in the investigation of its tax liability, Judicial Watch could simply resist the audit, force the IRS to initiate a summons enforcement proceeding, and then challenge the validity of the audit in that forum. *See* 26 U.S.C.A. § 7604(a) (West 2002). (Indeed, Judicial Watch has done precisely this in the District of Columbia.) In the event that an audit led to revocation of Judicial Watch's 501(c)(3) status, the organization could seek declaratory relief. *See* 26 U.S.C.A. § 7428. Furthermore, to the extent that the audit culminated in the determination and assessment of a tax deficiency, Judicial Watch could pursue an internal appeal with the Service pursuant to 26 C.F.R. § 601.106 (2002); pay the tax in full and sue for a refund in a federal district court pursuant to 26 U.S.C.A. § 7422 (West 2002); or contest the deficiency in Tax Court pursuant to 26 U.S.C.A. § 6213(a) (West 2002). Finally, Judicial Watch could also contest IRS actions during the collection process by requesting a hearing before the IRS Office of Appeals and seeking subsequent judicial review of any adverse determination pursuant to 26 U.S.C.A. § 6330(b) (West 2002).

With respect to alleged misconduct by individual IRS employees, Congress has also provided for a variety of "safeguards and remedies." *Chilicky*, 487 U.S. at 425. Specifically, Congress created the

Treasury Inspector General for Tax Administration, an entity separate and distinct from the IRS, with responsibility for investigating allegations of misconduct by IRS employees. *See* 5 U.S.C.A. App. 3 § 2 (West 1996 and West Supp. 2002). In this case, the Inspector General conducted not one, but two, investigations — both of which found no support for Judicial Watch's allegations that the IRS initiated the audit for purposes of political retaliation. *See United States v. Judicial Watch, Inc.*, Misc. Action No. 02-144 (ESH) (D.D.C. Dec. 11, 2002) slip op. at 22.

Moreover, Congress has also provided a civil damages action for misconduct by IRS employees in connection with the collection of taxes. *See* 26 U.S.C.A. § 7433 (West 2002). Originally enacted in 1988 as part of the "Taxpayer Bill of Rights" (the name itself speaks volumes about Congress's explicit consideration of the remedies available to taxpayers), § 7433 states in pertinent part:

> If, in connection with any collection of Federal tax with respect to a taxpayer, any officer or employee of the Internal Revenue Service recklessly or intentionally, or by reason of negligence disregards any provision of this title, or any regulation promulgated under this title, such taxpayer may bring a civil action for damages against the United States in a district court of the United States. Except as provided in section 7432, such civil action shall be the exclusive remedy for recovering damages resulting from such actions.

26 U.S.C.A. § 7433 (West 2002).

To be sure, § 7433 provides for a "civil action" only for damages arising from the "collection" of taxes, not for damages arising from the investigation and determination of tax liability. That Congress chose not to create certain remedies as part of the complex statutory scheme regulating the relationship between taxpayers and the IRS lends Judicial Watch little support, however. As the Supreme Court put the matter,

> [t]he question is not what remedy the court should provide for a wrong that would otherwise go unredressed. It is whether an elaborate remedial system that has been con-

structed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue. That question obviously cannot be answered simply by noting that existing remedies do not provide complete relief for the plaintiff.

*Bush*, 462 U.S. at 388.

The legislative history of § 7433 further suggests that Congress did not act inadvertently in failing to create an action for damages allegedly arising from the investigation or determination of tax liability. As originally introduced into the Senate, the draft provision that ultimately became § 7433 contained broader language permitting civil damages actions "in connection with any determination or collection of Federal tax" and in violation of "any provision of Federal law." S. 2223, 100th Cong., 2d Sess. § 123 (1988). The Conference Report regarding § 7433 explained that the final version was

limited to reckless or intentional disregard in connection with the collection of tax. An action under this provision may not be based on alleged reckless or intentional disregard in connection with the determination of a tax. . . . [T]he provision is limited to reckless or intentional disregard of the Internal Revenue Code and the regulations thereunder. An action may not be brought under this provision based on an alleged violation of a Federal law other than the Internal Revenue Code or a regulation promulgated thereunder.

H.R. Conf. Rep. No. 100-1104, at 229 (1988), reprinted in 1988-3 C.B. 473, 719. Thus, it appears that Congress has indeed considered, and rejected, a broader damages remedy that would have covered wrongful actions by IRS agents in the course of an audit.

Taken together, therefore, Congress's considerable attention to the rights and remedies available to taxpayers and the Supreme Court's hesitancy in creating *Bivens* remedies in such circumstances provide strong support for the conclusion that no *Bivens* remedy lies in this case. This conclusion comports with the view of a number of our sister circuits. *See, e.g.*, *Schreiber v. Mastrogiovanni*, 214 F.3d 148,

152-53 (3d Cir. 2000) (declining to extend a *Bivens* remedy to tax-payer who allegedly suffered violation of constitutional rights in connection with assessment of tax liability); *Dahn v. United States*, 127 F.3d 1249, 1254 (10th Cir. 1997) (stating that "in light of the comprehensive administrative scheme created by Congress to resolve tax-related disputes, individual agents of the IRS are also not subject to *Bivens* actions"); *Fishburn v. Brown*, 125 F.3d 979, 982-83 (6th Cir. 1997) (declining to create *Bivens* action against IRS agents for alleged due process violations during property seizure); *Vennes v. An Unknown Number of Unidentified Agents of the United States*, 26 F.3d 1448, 1454 (8th Cir. 1994) (declining to create *Bivens* action against IRS agents for alleged violation of due process rights during seizure of business and jeopardy assessment).

Judicial Watch, however, correctly notes that none of these cases address whether a *Bivens* action is available for damages arising from an allegedly retaliatory audit, and contends that such an audit presents a far stronger claim to *Bivens* relief. In support of this contention, Judicial Watch cites our decision in *White v. Boyle*, 538 F.2d 1077 (4th Cir. 1976). There, we suggested in dicta that a *Bivens* remedy should be available to a taxpayer alleging a retaliatory investigation of his tax liability. *Id.* at 1079 ("Clearly, if [the taxpayer] can demonstrate an injury consequent upon the violation by federal agents of his constitutionally protected rights, absent official immunity, he is entitled to recovery."). But we decided *White* more than a decade before *Chilicky*, and did not attempt to analyze whether the factors explicated in *Bivens* and *Chilicky* counseled recognition of a *Bivens* action for damages assertedly arising from a retaliatory audit.

Indeed, no appellate court has ever reached that question. Recently, the Ninth Circuit specifically declined to do so because limitations barred the claim in any event. *See Western Center for Journalism v. Cedarquist*, 235 F.3d 1153 (9th Cir. 2000). In that case, Judge Reinhardt issued a concurring opinion explaining that he believed a *Bivens* action did lie for damages resulting from a retaliatory audit. *Id.* at 1159 (distinguishing *Chilicky* and *Bush* because in those cases Congress afforded some, even if not complete, relief for constitutional violations, while in the case of an assertedly discriminatory audit, "Congress has created no remedy at all"). This view finds some support in *National Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521

(10th Cir. 1994), which allowed a *Bivens* action on claims that harassment by IRS agents violated the plaintiffs' First and Fourth Amendment rights. Employing reasoning similar to that of Judge Reinhardt, the Tenth Circuit concluded that in situations where the Code does not provide any mechanism for compensation, IRS agents are not shielded from liability simply because the Code contains remedies for other, unrelated violations. *Id.* at 1530-32.

But neither *Cedarquist* nor *Archer* contains any discussion of § 7433, much less its legislative history evidencing Congress's considered decision to forego creating a damages remedy for misconduct by IRS employees in connection with the determination of taxes. Moreover, circuit precedent forecloses adoption of the *Cedarquist-Archer* view here. We have recently held that even though a federal statutory scheme (the Civil Service Reform Act) provided the plaintiffs with *no* remedy (because of a statutory exemption), its "comprehensiveness" precluded any *Bivens* claim. *See Zimbelman*, 228 F.3d at 370-71.

Our view seems consistent with Supreme Court teaching in this field. We note that the Court has never required that the remedies available in the context of a larger statutory scheme be perfect; just that they be "meaningful." *See Chilicky*, 487 U.S. at 428 (recognizing that although "suffering months of delay in receiving the income on which one has depended for the very necessities of life cannot be fully remedied by the belated restoration of back benefits" the fact that Congress had made compromises involved in administering a vast and complex government program meant that there was no basis for judicial intervention (internal quotation marks omitted)). Even if "Congress has provided a less than complete remedy for the wrong," any decision to create a new judicial remedy must be "exercised in the light of relevant policy determinations made by the Congress." *Bush*, 462 U.S. at 373; *see also Malesko*, 122 S. Ct. at 520 ("So long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability." (citations omitted)). That Judicial Watch considers its existing remedies insufficient is simply irrelevant. *See Zimbelman*, 228 F.3d at 371 ("It is not relevant that plaintiffs believe the procedures governing their employment relationship were insufficient.").

We conclude, therefore, that in this case "it would be inappropriate to supplement [the] regulatory scheme with a new judicial remedy" for alleged retaliatory tax audits. *Bush*, 462 U.S. at 368. As in *Chilicky*, although "[t]he creation of a *Bivens* remedy would obviously offer the prospect of relief for injuries that must now go unredressed," the fact that Congress "has not failed to provide meaningful safeguards or remedies for the rights of persons" similarly situated counsels against any judicial extension of *Bivens* liability. *Chilicky*, 487 U.S. at 425. Indeed, the fact that Congress explicitly considered allowing damages claims under § 7433 for misconduct in connection with the *determination* of taxes but decided to restrict those actions to the *collection* of taxes strongly suggests "that congressional inaction has not been inadvertent." *Id.* at 423. We thus decline "to create a new substantive legal liability . . . because we are convinced that Congress is in a better position to decide whether or not the public interest would be served by creating it." *Id.* at 426-27 (quoting *Bush*, 462 U.S. at 390).

IV.

For the reasons set forth within, the judgment of the district court is

*AFFIRMED*.